Tallulah **MORGAN** et al., Plaintiffs,

v.

John A. **NUCCI** et al., Defendants.

Civ. A. No. 72–911–G.

United States District Court,
D. Massachusetts.

Sept. 3, 1985.

Memorandum Regarding Final Orders
Nov. 1, 1985.

Robert Pressman, Center for Law & Educ., Cambridge, Mass., Laurence S. Fordham, Foley, Hoag & Eliot, Boston, Mass., for plaintiffs.

Caroline Playter, Kehoe, Doyle, Playter, Novick & Strimaitis, Boston, Mass., Kenneth Kimerling, Puerto Rican Legal Defense & Education Fund, Inc., New York City, for El Comite.

Robert Blumenthal, State Bd. of Educ., Quincy, Mass., Joan Entmacher, Asst. Atty. Gen., Boston, Mass., for State Bd. of Educ.

Steven P. Perlmutter, Asst. Corp. Counsel, City Law Dept., Boston, Mass., for Mayor, City of Boston.

James T. Grady, Grady, Dumont & Dwyer, Boston, Mass., for BTU-Boston Teachers Union.

Richard W. Coleman, Segal, Roitman & Coleman, Boston, Mass., for BASAS-Boston Ass'n of School Adm'rs and Supervisor.

Henry C. Dinger, Goodwin, Procter & Hoar, Boston, Mass., for defendants.

Martin A. Walsh, Community Relations Service, Dept. of Justice, Boston, Mass., for Community Relations.

Lucille Koch, Evalena Higginbottom, Acting co-Executive Directors, Citywide Parents Council, Boston, Mass., for Transition Committee.

Marshall Simonds, Henry C. Dinger, Goodwin, Procter & Hoar, Michael Betcher, Boston School Committee, Shirley Burke, Director of ELU, Boston School Committee, Dept. of Implementation, Boston, Mass., for Special Counsel Boston School Committee and Boston School Dept.

Nancy Gertner, Silvergate, Gertner, Baker & Fine, Boston, Mass., Grover G. Hankins, Gen. Counsel, N.A.A.C.P. Special Contribution Fund, Thomas I. Atkins, Brooklyn, N.Y., for Concerned Black Educators of Boston.

## FINAL ORDERS

GARRITY, District Judge.

After hearing and consideration of the parties' comments and positions on the draft final judgment[1] issued on July 5, 1985, and on the basis of all orders and memoranda of decisions previously entered in these proceedings, it is ORDERED and ADJUDGED that the school defendants, viz., members of the Boston school committee, Superintendent of Schools, their officers, agents, servants employees, attorneys, and all other persons in active concert or participation with them who have actual notice of these orders:

### Unified Facilities Plan

(1) shall take all steps reasonably necessary, jointly with the city and state defendants, to whom this paragraph also applies, to implement the Unified Facilities Plan as approved and modified by orders entered contemporaneously herewith.

### Permanent Injunction

(2) be permanently enjoined from discriminating on the basis of race in the operation of the public schools of the City of Boston and from creating, promoting or maintaining racial segregation in any school or other facility in the Boston public school system;

### Student Assignments

(3) (a) shall compose enrollments at each school so that its racial/ethnic proportions shall be consistent with current guidelines

---

1. In titling these orders "Final Orders" instead of "Final Judgment", as first drafted, we follow the precedent and adopt the reasoning of Judge McMillan in removing the cause from the active docket and closing the file in *Swann v. Charlotte-Mecklenburg Board of Education*, W.D.N.C. 1975, 67 F.R.D. 648.

which shall be derived, with respect to city-wide magnet schools and programs, from the citywide public school population and, with respect to district schools, from the public school populations of their current districts or consolidations thereof; and procedures for assigning students shall be objective, written and available to the public.

(b) alternatively, may beginning with the 1986–87 school year or thereafter use a single, citywide guideline for assigning students by composing enrollments at every school (except District 8 schools) so that its racial/ethnic proportions exclusive of entering K–1 students are within a range determined by a factor of .25 times the percent of each racial/ethnic group and are based upon the citywide public school population in K–1 through 12 as of about April 1 of the previous school year, minus (i) students enrolled in bilingual classes, (ii) students with special needs who are classified as substantially separate and (iii) students residing in District 8; provided further that, where necessary, the Department of Implementation may assign no other minority students to selected elementary schools, in which event their absence shall be offset by additional white students; and provided further that procedures for assigning students shall be objective, written and available to the public.

### Parent Councils

(4) shall promote the court-established parent councils, and any successor organizations, and assist them in functioning as self-governing organizations capable of meeting their court-ordered responsibilities; and shall fund them for at least three years from this date; and shall appoint to any School Improvement Council formed at any school pursuant to Chapter 188 of the Acts of 1985, parent membership elected by the related School Parent Council or successor organization.

### Faculty and Staff

(5) shall achieve and maintain a desegregated faculty and administrative staff which are each comprised of not less than 25% blacks and 10% other minorities, by increasing the proportions of black faculty and administrative staff at a rate of not less than one-half percent annually and the proportion of other minority faculty at the rate of not less than one-quarter percent annually, and of other minority administrative staff in accordance with the parties' agreement for a one out of three hiring ratio, approved and ordered by the court on November 26, 1984 and July 5, 1985.

### Department of Implementation

(6) shall maintain the Department of Implementation as a distinct unit, adequately staffed and with full access to computer facilities, capable of meeting its court-ordered responsibilities;

### Previous Orders

(7) shall carry out all existing orders imposing a duty on the school defendants previously entered in areas in which the court has not terminated its jurisdiction and, if modified as hereinafter provided, such modified orders.

### Modification Procedure

(8) The school defendants may propose modifications to any order previously entered in these proceedings provided (a) that such proposed modification is specific and does not violate the permanent orders stated in the seven preceding paragraphs and (b) that notice and opportunity to be heard is given, as follows: they shall issue a public notice identifying the order to be modified and the proposed modification; and shall mail copies to (a) the State Board of Education, (b) the Attorney General for the Commonwealth, (c) the Mayor, (d) the Citywide Parent Council (e) the Boston chapter of the NAACP and (f) the Council of Administrators of Hispanic Agencies in Boston (CAHA), to all of whom the Department of Implementation shall promptly make available all relevant data reasonably requested. The Board of Education shall within three weeks initiate and moderate negotiations concerning the proposed modification or determine that the proposed

modification is insubstantial or an emergency matter which the School Committee may adopt without negotiation. After agreement has been reached or the Board has determined that further negotiations would not result in agreement, or more than three months have passed since the public notice was given, whichever is earliest, the School Committee may (unless State Board approval is necessary under state law and has not been obtained) adopt or reject such proposed modification either as initially proposed or amended during negotiations.[2]

### MEMORANDUM REGARDING FINAL ORDERS [1]

The school defendants' recent compliance with some aspects of the student desegregation plan issued years ago warrants the entry of final orders in this case. On the other hand, considerable unfinished business in the prolonged process of desegregating Boston's public schools requires the court's retention of standby jurisdiction in six of the twelve categories of its remedial orders. In these respects the orders dated September 3, 1985 are the "logical next step" in the court's disengagement, forecast in its memorandum dated December 23, 1982, as well as the court's response to the State Board's recommendation in its July 15, 1985 report, seconded by Mayor Raymond L. Flynn in his letter dated July 26, 1985, that "the disengagement of the Court will not impede further progress toward the realization of a unified school system in Boston."

The final orders are based not only upon the findings and conclusions stated herein and in the July 5 memorandum and at hearings in open court, but also upon memoranda and orders previously entered in these proceedings, especially those cited *post*, and the five semi-annual monitoring reports filed by the State Board, the first dated July 15, 1983 and the last, July 15, 1985. These comprehensive volumes reported to the court and parties the compli-

ance vel non achieved by the school defendants with court orders in the twelve subdivisions of the student desegregation plan. Familiarity with the State Board reports is virtually indispensable to an understanding of all orders entered in these proceedings during the past two years.

■ Final orders are now appropriate because the school defendants have taken several major steps within the past year toward curing the deficiencies in compliance described in the series of State Board reports. In particular, *inter alia,* (a) they obtained agreement from the parties and court approval by order entered November 26, 1984 of a new plan for appointing and promoting administrators, so as to correct the situation whereby approximately half the administrators in the system held their positions only in an acting capacity; (b) as detailed in a report filed February 4, 1985, they reduced systemwide capacity by 1,719 seats so as to reflect current and projected enrollments, thereby lessening the prospect of resegregation; (c) by motions filed December 20, 1984, they proposed numerous changes in student assignment procedures that were adopted, with various modifications, by court orders entered on February 20, May 24 and May 30, 1985, including a new assignment pattern for community districts 3 and 4, all toward increasing existing options for student assignments; (d) on March 25, 1985 they joined with the city and state defendants in filing the long-promised Unified Facilities Plan (UFP), adopted by the court with modifications; (e) on April 30, 1985, they adopted a revised Voluntary *Lau* Compliance Plan, vindicating the rights of limited English speaking children, which replaced a 1979 plan that had never been carried out; and (f) on August 28, 1985 they reached final agreement with the State Board on a new Unified Plan for Occupational and Vocational Education (UPV), adopted by the court on

---

**2.** A memorandum regarding these final orders will be filed at a later date.

**1.** This memorandum is supplementary to the court's July 5, 1985 memorandum and should be read in conjunction with it.

September 3, 1985, replacing a 1978 UPV they had ignored in many respects.

Also, the court's concerns have been narrowed substantially by cessation of its jurisdiction in half of the original twelve categories in which it issued remedial orders.[2] By orders dated October 31, 1984, May 17, 1985 and August 8, 1985, entered after notice and hearing, jurisdiction ended with respect to (i) special education, (ii) pairings of colleges, universities and business institutions with particular schools and community districts, (iii) school safety and security, (iv) student discipline, (v) bilingual education, and (vi) student transportation. The court will no longer entertain motions or applications based upon provisions of the 1975 plan or separate orders relating to these six subject matters.

■ The remaining categories, five instead of six because the State Board's final report No. 5 combined "student assignments" and "special desegregation measures", formerly separate, into one category, are (i) vocational and occupational education, (ii) school facilities, (iii) student assignments and special desegregation measures, (iv) staff desegregation, and (v) parent and student organizations. While significant progress has been achieved in these areas, the State Board reports show that each entails some unfinished planning, implementation or monitoring. For examples, (i) the vocational and occupational education plan (UPV) completed and agreed upon by school defendants, State Board, and plaintiffs and plaintiff intervenors in August 1985, schedules various dates in 1986 for filing with the State Board plans with respect to an admissions policy for the Humphrey Occupational Resource Center (HORC), the merger of HORC and Madison Park High School, bilingual vocational edu-

cation, career guidance and counseling, and other program matters. (ii) The Unified Facilities Plan (UFP) filed with the court in March 1985, had only this to say about proposed capital improvement and construction intentions for the two Latin schools, "An architect is preparing plans for this project" and "all of the particulars have yet to be developed." No plans, either partial or comprehensive, have been presented to date to the State Board, whose approval is a condition precedent to court approval. (iii) New student assignment procedures proposed by school defendants and approved by the court depend in part upon the school defendants' performance in maintaining desegregation at the level achieved in some districts during the 1984–85 school year. In addition, desegregative reservation of some seats in 27 schools without regard to student residence was frozen for two years and made subject to monitoring and evaluation by the State Board. More generally, the school defendants have never fully implemented the 1975 student desegregation plan with respect to assignments. This finding is supported by the State Board monitoring reports and various court memoranda, e.g., the memorandum dated May 24, 1985. (iv) Staff desegregation compliance remains incomplete because the school defendants have made very little progress since 1981 toward achieving the goals of the 25% black and 10% other minority composition of the certified and teaching personnel. In its Report No. 5, at p. 395, the State Board concluded, "The integration of the teaching staff ... has stalled. ... In filling teacher vacancies, Boston has barely maintained the minimum requirements set by the Court, and has made no progress toward the affirmative action goals." (v) Of parent organiza-

---

**2.** In its efforts to develop a comprehensive consent decree during 1981 and 1982, the State Board organized all remedial orders issued by the court between 1974 and 1981 into twelve categories. This breakdown was carried forward in the court's memorandum and orders of disengagement issued on December 23, 1982, Appendix I, and the State Board undertook to monitor progress toward compliance by school defendants within each of these categories. The aim of the court and the parties at that time was to lay a foundation of fact on which to erect decisions as to final disengagement. Two monitoring reports were filed in each year from 1983 to 1985, five in all, on the basis of which and by orders dated October 31, 1984, May 17, 1985, and August 8, 1985, entered after notice and hearing, jurisdiction ended with respect to these six categories.

tions, State Board Report No. 5, at p. 465, concluded, "Strong efforts must continue in order to create a stable and effective parent organization." In the light of such findings, this case is not ripe for entry of final judgment. The relatively recent commitments by the school defendants to carry out longstanding orders of the court in these areas are too inchoate to deny outright to plaintiffs and plaintiff-intervenors all opportunity for judicial review.

Therefore a middle course seems appropriate, one charted by Judge McMillan under comparable circumstances in the Charlotte, North Carolina, schools desegregation case, namely, to remove the cause from the active docket and close the file. As explained in *Swann v. Charlotte-Mecklenburg Board of Education*, W.D.N.C. 1975, 67 F.R.D. 648,

> Though continuing problems remain, as hangovers from previous active discrimination, defendants are actively and intelligently addressing these problems without court intervention. It is time, in the tenor of the previous order, to be "closing the suit as an active matter of litigation ..."

Dismissal is neither usual nor correct in a case like this where continuing injunctive or mandatory relief has been required. Facts and issues once decided on their merits ought, generally, to remain decided. This case contains many orders of continuing effect, and could be re-opened upon proper showing that those orders are not being observed. The court does not anticipate any action by the defendants to justify a re-opening; does not anticipate any motion by plaintiffs to re-open; and does not intend lightly to grant any such motion if made. This order intends therefore to close the file; to leave the constitutional operation of the schools to the Board, which assumed that burden after the latest election; and to express again a deep appreciation to the Board members, community leaders, school administrators, teachers and parents who have made it possible to end this litigation.

### (1)

Turning to the eight numbered paragraphs of the final orders, facilities' renovation heads the list because of its surpassing importance. Not much can be added to the UFP orders, which are incorporated by reference, and the court's explanatory memorandum, both dated September 3, 1985, except this: if the president and members of the school committee and the mayor and members of the city council of Boston really care about public education in the city, as they keep professing, they will address and remedy the disgraceful physical condition of its public school buildings.[3]

Unfortunately, every Boston public school construction or renovation project is plagued by indecision and inefficiency. For instance, it took several years and court appointment of a special monitor to build Madison Park High. Most recently, on May 9, 1985, the court entered an order approving, in advance of other parts of the UFP, so-called first year projects for new roofs and heating plants urgently needed at ten schools. The school defendants had filed a motion on April 29 noting "the need for these first year renovations to take place during the summer." An assenting memorandum filed by the plaintiffs on May 7 stated, "the first year alterations and repairs were represented to be of a crisis nature, bearing upon the fitness of buildings for use." Yet at a hearing on October 2, 1985 it was disclosed that plans for only three of these ten emergency projects had been submitted to the State Board in time for their approval before the beginning of the 1985–86 school year. In fact, as of October 2, 1985 plans for the remaining

---

**3.** And maintain them decently. A minimum level of funding of annual maintenance and repairs is a bone of contention between the city and school defendants, on the one hand, and the State Board, which has conditioned its commitments in the UFP to Boston's raising this minimum from its present level of $6,000,000 to $8,000,000. See pp. 17–19 of court's memorandum on UFP orders dated September 3, 1985.

seven projects had not even been filed with the State Board! The first year projects are but a small part of the total UFP. The question inevitably arises: will the joint planners persevere and carry out their promises made in the UFP? In view of the dismal record to date, plaintiffs and plaintiff-intervenors will simply have to keep their fingers crossed.

### (2)

As for the permanent injunction in paragraph (2), all parties accepted the draft order language proposed on July 5, 1985; and so it is retained. As there explained, this order repeats the injunction prohibiting discrimination and segregation on the basis of race which was initially issued in 1974 as a partial judgment following the court's finding of liability. *Morgan v. Hennigan*, D.Mass.1974, 379 F.Supp. 410, 484. It is a broad, partial statement of the plaintiffs' rights in the remedial stage of a desegregation case; partial because plaintiffs are also entitled to specific affirmative relief from the continuing effects of past discrimination. *Green v. County School Board of New Kent County*, 1968, 391 U.S. 430, 437–438, 88 S.Ct. 1689, 1693–94, 20 L.Ed.2d 716.

### (3)

Two provisions for student assignments are made in paragraph (3). The first continues the current student assignment guidelines which the school defendants may employ in 1986–87 or thereafter.[4] These guidelines are not the ones set forth in the 1975 student desegregation plan and left in place with occasional minor modifications from 1975 through June of 1985. Rather, they are guidelines that were extensively modified on the basis of proposals

moved by the school defendants on December 20, 1984, and revised after court hearings between that date and June 1985. Those proposals were designed, according to the school defendants, to improve the fit between a decade of demographic changes in Boston and the terms of student access to educational opportunities; to enlarge the range of options available to parents; to stimulate outreach and recruitment of students across racial lines by individual schools and community districts; to lessen the rigidity inherent in assignment procedures; and to safeguard the school system against tendencies toward resegregation in some community districts.

The 1985 changes made in the student assignment guidelines and procedures, explained in court memoranda dated February 20, April 2, May 24 and May 30, 1985, demonstrated two differences between conditions in 1975 and 1985. First, the parties cooperated with each other and with the court; whereas such cooperation was wholly lacking in 1975. Second, the changes underscored the school defendants' freedom in 1985 to adopt new assignment methods as long as the resulting enrollments reflect the racial/ethnic proportions of the relevant public school student population.

The student assignment portion of the 1975 desegregation plan contains two major components. One is the method of assigning students to community district schools, viz., according to the geocode in which they reside, while incorporating magnet school assignment options exercised by parents on a citywide basis. In practice, about 70% of parents choose community district assignment and about 30% choose citywide magnet schools.[5] Under para-

---

**4.** The draft of this paragraph proposed by the court on July 5, 1985, set, as the standard of compliance, assignment of students "so that to the greatest degree practicable the racial/ethnic composition of each community district school reflects the public school student population...." The final order is partly a response to one of the objections advanced by the school defendants to the original draft, viz., that the "greatest degree practicable" standard, though taken verbatim from the decision of the Supreme Court in *Swann v. Charlotte Mecklenberg*

*Board of Education, supra,* 402 U.S. 1, 91 S.Ct. 1267, 1281, 28 L.Ed.2d 554 (1971), is insufficiently specific and objective to comply with Rule 65(d), Fed.R.Civ.P.

**5.** This component makes provision for a proportion of voluntary preferences for magnet schools that is substantially greater than the proportion available in all but four of the nation's thirty largest public school districts.

graph (3) of the final orders and the 1985 changes, this component of the assignment remedy may be amended or discontinued as a court order, after compliance with the modification procedure spelled out in paragraph (8). On the other hand, all or parts of it may be kept in place by the school defendants.

The other is the racial/ethnic composition of school enrollments. This component is preserved under paragraph (3), although no longer tied to district boundaries, geocodes, grade structures, or other mechanisms used as part of the first component. Examination of the particulars underlying the guidelines will indicate why, in the court's opinion, the guidelines governing school enrollments are essential for remedial equity and for the operation of a racially unitary system which functions without racial discrimination and without the continuing effects of past discrimination.

The enrollment guidelines are based upon the racial/ethnic composition of the public school population within each community district and at each grade level: elementary, middle, and high school. Thus they vary as a function of diverse racial/ethnic distributions by residence and of the age groupings of students. They may change over time as these distributions change and they are designed to prevent the imposition of an arbitrary standard. They are flexible in another respect as well: assignment totals at a particular school may diverge from the community district standard within a range established by adding and subtracting 25% from each racial/ethnic group's proportion (except in the case of black students assigned to community district schools in districts 4 and 5, where the allowable range is limited to a 10% departure from the black student proportions). Thus, for example, if 48% of the

elementary school students residing in a subdistrict consisted of a particular racial/ethnic group, 25% of 48, i.e., 12, would be added and subtracted to result in an allowable range from 36% to 60% for the assignment of these students to each elementary school in the community district.

The enrollment guidelines applicable to magnet school district 9 are based on the racial/ethnic makeup of the public school student population of the entire city, exclusive of district 8, at each grade level. The range of permissible assignments to district 9 schools is narrower than the range allowed for community district schools, partly in order that assignments to the magnet schools will not interfere with compliance with the community district school guidelines. Each school must be assigned students so that the percentage of each of two racial/ethnic groups[6] is within five percentage points of the citywide percentage. Thus, assuming a citywide public high school population of 50% black students and 50% combined white and other minority, the range of permissible assignments for both groups would be 45–55%.

There are two exceptions to the uniform application of the magnet school guidelines. The Hernandez School and schools based on the Hernandez model[7] are permitted to enroll a population up to 50% of the non-English-speaking group being served. This exception is necessary to create a truly bicultural environment at the schools. The second exception is the examination schools, Boston Latin, Latin Academy, and Technical High School, which are required to accept student enrollments in entering classes which are at least 35% black and hispanic, provided that no student with an exam score below the 50th percentile will be admitted.

6. As provided in an order dated May 24, 1985, each of the least populous groups, white and other minority students, which are combined for assignments to magnet schools, shall be assigned to each school in numbers roughly reflecting their respective percentages of citywide public school student population.

7. The Hernandez has proven to be a successful and attractive bilingual school and the school committee voted to transfer it to a larger facility and expand the program to include a middle school by September 1986. Its development and magnet program are described in R. Dentler and M. Scott, SCHOOLS ON TRIAL, An Inside Account of the Boston Desegregation Case, at 160–62 (1981).

In addition, schools in any district whose enrollments fall outside the ranges set by the guidelines solely because of appropriate bilingual or special education assignments for students with severe special needs are deemed to be in compliance with enrollment guidelines. Similarly, since the court's order of March 24, 1982, compliance has not been affected by enrollments falling outside the guidelines in locations where other minority students make up less than 10% of the relevant community district population.

In the final orders, the integrity of the guidelines for community district schools is maintained by requiring that they continue to be derived from the present eight community districts or consolidations thereof, because the absence of this requirement would allow the redrawing of district lines in ways permitting the return of racial isolation of students within racially identifiable schools. For example, if district lines were to be changed so as to make them congruent with election districts for School Committee members, the results would induce a return to segregated schools. The final orders also prevent the evolution of new district lines, for whatever reason, which might render the residential composition to be skewed greatly from one community district to the next. Thus, there is no requirement under paragraph (3) that students assigned to a particular school be residents of the district in which the facility is located, yet each school's enrollment must reflect the racial/ethnic proportions of the public school student population of the district in which it is located. Absent such a linkage, any one school's racial identifiability might be rationalized as an accident of housing patterns—a return to conditions characteristic of 1972.

The final orders do not return full control over student assignments to the school defendants, because compliance with the student desegregation plan, as amended, has never been achieved and because changes made during 1985 have yet to be fully implemented or evaluated. It is also true that they prevent the revival of a neighborhood school policy, found in 1974 in *Morgan v. Hennigan,* D.Mass.1974, 379 F.Supp. 410, 473, to have been "so selective as hardly to have amounted to a policy at all ... a reality only in areas of the city where residential segregation is firmly entrenched." Rather the final orders seek to provide assignment guidelines for future years which are as flexible as consistency with a workable student desegregation plan permits; and an irreducible minimum of safeguards for insuring a future in which the Boston public schools may flourish on a racially unitary, racially unidentifiable, yet flexible and clear foundation of equal access and equal educational opportunity for all students.

A departure from the geocode method of assigning students, analogous to the new assignment pattern for districts 3 and 4, is provided in alternative paragraph (3)(b). The school system has changed in so many ways since 1975 that a new, simplified method of assigning students may, in the judgment of the school defendants, be preferable to the current guidelines. The eight community districts whose configuration was at the heart of the 1975 plan and whose racial/ethnic public school student populations, except for district 8, corresponded generally to that of the city as a whole, now differ widely from one another in population composition. For example, other minority students comprise approximately 25% of the citywide population, but one district is now 50% other minority and another is 4%. Under the 1975 plan, community districts were to be relatively autonomous, with district councils of principals and parents working with the district superintendent to plan programs best suited to the district. The former trend toward decentralization has been reversed since 1980 and control has been centralized at school department headquarters; the number of community superintendents and staff has been reduced from 8 to 4; and principals' councils and community district supervisory councils exist in name only. It was expected in 1975 that each community district would be able to house programs for its bilingual and substantially separate

special needs students. However, within five years bilingual students increased threefold and substantially separate special needs students by sixfold, and it became necessary to assign large numbers of them across district boundaries. The 1975 plan anticipated changes in geocodes attached to particular schools and subdividing geocodes to meet changes in demographic and other conditions. This was never done except when required by school closings. Allowance of the school defendants' motions filed December 20, 1984 and the court's order dated May 24, 1985 and other orders have sharply increased the number of student assignments across community district boundaries.

If implemented by the school defendants, paragraph (3)(a) would work to increase the flexibility of student assignment procedures relative to the 1975 court plan, but those procedures would remain quite complex. Paragraph (3)(b) provides an alternative for voluntary adoption by the school defendants which appears to be workable and flexible but which is also simpler for educators, parents, and students to understand and more readily administered by the Department of Implementation. Under paragraph (3)(b), a single guideline would be calculated by setting aside students enrolled in bilingual classes, students with severe special needs which require substantially separate classrooms, and students residing in East Boston (now Community District 8). All other public school students in the city would be pooled to compute an annual racial/ethnic composition of current enrollments. Students would then be assigned to each school within a range obtained by adding and subtracting ¼ of the citywide percentage—the range already long-established in Boston. To test this guideline, the court made approximations using enrollments for the 1984–85 school year. These indicated percentages of 56% black, 27% white, and 17% other minority. Thus, after applying the ¼ permissible range factor, each school would be from 42% to 70% black, 20% to 34% white, and 13% to 21% other minority.

Four readily implemented departures from the single assignment guideline would be permitted: (a) the examination schools would continue to be composed on the basis of competitive entrance examinations under the terms currently specified; (b) public school students residing in East Boston would be assigned desegregatively to local facilities in proportion to their racial/ethnic composition; (c) because some elementary school sites are located so remotely from Asian, Hispanic, and Native American residential concentrations as to impose an inequitable transportation burden on these other minority students, the Department of Implementation (DI) would have discretion to assign no other minority students to elementary schools which would require their excessive transportation; and (d) in that event, their absence would be offset by the addition of white students.

Further study and simulated assignments by the school defendants may reveal other problems, advantages, and disadvantages to the single guideline here suggested. The obvious advantage is that the complexities of the present procedure would be largely eliminated. The school defendants would be free (a) to revise community district boundaries or eliminate them altogether, (b) to introduce citywide the new assignment pattern authorized for districts 3 and 4, (c) to convert some district schools to magnet schools and vice versa, (d) to change magnet programs and grade structures, and (e) to retain all or part or none of the present geocode basis for community district assignments. The school defendants could themselves decide how to meet their responsibility to maintain desegregated student bodies at all schools.

Both parts of paragraph (3) specify that the procedures for assigning students be objective, written and available to the public. This requirement has been the cornerstone of student assignment procedures since 1974 and must remain. Since its formation the DI has been under constant pressure from officials within and without the school system to make assignments arbitrarily in favor of parents with the right connections. Under the leadership of

Senior Officer John R. Coakley, the DI has stood fast and the 1975 student assignment plan has been implemented conscientiously. Otherwise assignment procedures would be a shambles and, in the court's opinion, the system would now be well on the road to resegregation.

(4)

The history of the creation and reorganizations of parent councils has been amply documented in previous court orders, including those issued on October 4, 1974, November 8, 1976, September 1, 1977, September 15, 1978, July 20, 1982 and August 25, 1982.[8]

The basic courtroom position of the school defendants has been that they support parent participation conceptually and financially, but only if done voluntarily rather than pursuant to court order. Their position in the Court of Appeals was that the district court, in ordering a continuation of school department funding of the parent councils, had exceeded its authority because some of the activities of the councils were directed toward improving the quality of public education rather than desegregation; and that the court had not made findings of fact linking its order to "valid desegregation goals as yet unfulfilled." The school defendants also objected on the ground that the August, 1982 order was open-ended, i.e., did not include a termination date beyond which the order would not extend.[9]

As directed by the appellate court, the district court scheduled a hearing as to the school defendants' funding of the parent councils for August 17, 1984. On August 16, 1984, the school defendants and Citywide Parents Council filed the following stipulation:

The School Defendants and the Citywide Parents Council hereby stipulate and agree that the Fiscal Year 1984 budget for the Citywide Parents Council

shall be $577,400.00 and that the School Defendants shall, in addition, comply with the provisions of the October 4, 1974 Memorandum and Order Establishing Racial-Ethnic Councils regarding postage and stationery.

Substantially the same scenario was reenacted this year: mindful of (a) the uninterrupted funding of the parent councils by the school defendants for more than a decade, (b) the formal agreement between the school defendants and the parent groups filed with the court on November 17, 1982, (c) the new importance of parent council monitoring due to the diminution of the State Board's monitoring role, (d) the recent creation of School Improvement Councils by the Massachusetts Education Reform Act of 1985, and (e) the dedication and courage of hundreds of parents, in the face of efforts to discredit them, in monitoring compliance with court orders, paragraph (4) of the court's draft orders dated July 5, 1985 provided that the school defendants

shall maintain the Citywide Parents Council and School Parent Councils as adequately funded, self-governing organizations capable of meeting their court-ordered responsibilities;

The school defendants' response was filed on July 31, 1985. While seeking to preserve their customary, multiple objections on principle, they again stipulated as follows:

To dispel any inference that the School Defendants are seeking to undermine the parent councils by opposing paragraph 4, the School Defendants are prepared to agree to the requirements of this order for a fixed, limited period of time: three years.... They will waive their opposition to an order limited to a period not exceeding three years.

So paragraph (4), in reliance upon their waiver, contains a fixed, limited period of time: three years.

---

8. The order of August 25, 1982 was vacated by the Court of Appeals on February 2, 1984 and remanded for further proceedings not inconsistent with its opinion in *Morgan v. McKeigue*, 1 Cir.1984, 726 F.2d 33.

9. This was an inadvertence by the court, conceded at hearings in open court almost immediately after issuance of the order.

The next three years will be the most critical to the future success of the school system's continuing progress in student and staff desegregation and facility renovations, and during this time funding of the parent councils must be guaranteed. However, the need for amendments to the councils' bylaws is widely recognized. The parent councils should consider reorganization in a manner which will enable them, three years hence, to win voluntary financial support from the school defendants or some other source on the basis of their performance and positive impact on the school system, or become self-supporting. A possible approach would be to negotiate a restructuring plan with the school department which would include future funding. A broader involvement of other interested parties might be achieved by establishing a three-member mediation board comprised of a representative of the parent councils and of the school defendants and a neutral third party to screen and study various reorganization proposals. Another possibility would be to conduct a referendum of parents, perhaps by mail, identifying competing proposals.

The last clause of the paragraph is occasioned by new Massachusetts legislation improving and modernizing public elementary and secondary education throughout the state.[10] Among its far-reaching reforms is provision (in section 29 of the Act, amending Mass. G.L. c. 71 effective July 1, 1985 by adding a new § 88 to c. 71) for the establishment and state funding of a School Improvement Council (SIC) at every public school. Each SIC will be composed of twelve elected members, four parents, teachers and students, and from eight to ten appointed members. The statute provides that parent members shall be "elected by the parents of the children in that school." Unlike other cities and towns in the Commonwealth, Boston public schools already have school parent councils (SPCs) elected by the parents of the children. On the basis of the history of parent councils in Boston, including their 1982 formal agreement with the school committee, the importance of their role in the court's student desegregation plan and their need for strengthened official support,[11] the final order supersedes the comparable provision of the state statute by providing a two-step instead of a one-step procedure for electing parent members of SICs in Boston: parents elected to SPCs will elect parent members of SICs. There is precedent for this approach: the revised administrator screening and rating procedures proposed by the school defendants and adopted in pertinent part by order dated November 26, 1984 provides, at p. 9, that parent membership on screening committees for school-based positions shall be selected by SPCs.[12]

(5)

The draft paragraph on faculty and staff generated more objections and briefs than any other paragraph. It sought to tie the percentage of blacks to city population proportions, currently approximately 23%, and made no provision for other minorities whose rights it felt were adequately protected by orders entered November 26, 1984 and July 5, 1985. Acknowledging the validity of various criticisms, the court proposed a second draft at the hearing on August 7, 1985 and on the following day distributed to the parties statistical tables it had cited at the hearing.[13] The August 7

---

**10.** At the hearing on August 7, 1985 the court submitted to the parties a second draft of paragraph (4) which included the last clause as finally ordered.

**11.** The state legislature's policy idea for creating SICs drew directly from research on Boston's SPCs.

**12.** The cited motion, appended proposals and court order appear at pp. 513–539 of volume II of State Board Report No. 4 dated February 1, 1985.

**13.** Assumption (d) in the August 8, 1985 memorandum pertains to the average annual faculty turnover, i.e., number of retirements, resignations, extended leaves of absence etc. It should be clarified by the addition of three words, "that should be", which were omitted inadvertently, so that the phrase reads, "which is the figure *that should be* used in calculating net changes."

proposal eliminated the link to population proportions and called for specific annual increases until 25% goals first set in orders dated January 28, 1975 and February 24, 1976 should be achieved.

The final order provides for more gradual attainment of the 25% faculty goal than was proposed by both plaintiffs and school defendants. Their proposal would require increases in black faculty and administrators so that the 25% goal would be reached by the 1988–89 school year. The final order provides that this goal shall be attained with annual increments of at least .5% and does not specify a year for completion.

The difference between the parties' proposal and the final order stems from an empirical analysis and projection which disclosed the likelihood of faculty reductions in force due to steep declines in secondary school enrollments in the 1986–1990 period. If attainment of the 25% goal were fixed for 1988, white teacher discharges in fairly large numbers would have to take place simultaneously with the recruitment of significant numbers of black teachers. In the court's opinion, the current level of black faculty, 20.86%,[14] is too low to enable an increase to 25% in the same three-year period of time when faculty layoffs may reach large numbers. Since faculty desegregation is a remedy intended to strengthen equal access and equal educational opportunities for students, the instability that could result from very high rates of teacher turnover coupled with the effects of bumping due to the exercise of seniority is a condition that could frustrate those purposes.

The hypotheses underlying this opinion appear in the court's August 8 memorandum and tables. Assuming a turnover of 140, apportioned 112 non-black and 28 black, approximately 195 (307 minus 112) non-black teachers would be fired in 1986–87 contemporaneously with 50 (22 plus 28) black teachers being hired.[15] Under the final order, the same analysis and assumption of a faculty retrenchment crunch in 1986–87 produce a lesser number of non-black firings, about 151 (263 minus 112), and about 12 black firings as well (40 minus 28).[16]

The other main advantage to the more gradual increases required by the final order is that the average annual turnover of 140 is more than enough to permit compliance without discharges except in one year and without seniority, certification, retirement and other disputes occasioned by reductions in force. It should be noted, too, that, if the court's assumptions regarding student declines, faculty layoffs and retirements, student-teacher ratios and the like prove to be mistaken, there is of course nothing in paragraph (5) to prevent the school defendants from reaching the 25% goal sooner than ordered.

While early elementary grade enrollments will remain stable or may even increase gradually during the 1986–1990 period, providing an opportunity for swifter recruitment of black elementary teachers by the school defendants, there is a solid factual foundation for anticipating a steep decline in high school enrollments in this period. White teachers are more heavily concentrated in the high schools. In addition, reductions in force at the high school

**14.** As shown in Table 1 attached to the court's August 8 memorandum, hundreds of teachers, mostly white, were laid off in 1981. On June 2, 1981, the court ordered that recall rights of tenured teachers be protected and suspended the recruiting obligations of the school defendants. While white teachers were being recalled, there was scant recruitment of black applicants for faculty appointments. Last year, for example, only a single recruiting trip, to Howard University, was made. Also, as shown in the same table, the percentage of black faculty increased by a total of only 1.8%, from 19.1% to 20.9%, from 1981 until 1985.

**15.** The figures 307 and 22 are found in Table 2, Model A, which shows increases in black faculty needed to achieve a citywide population proportion of 23% by 1988–89, 2% less than the 25% target for that year urged jointly by the plaintiffs and school defendants.

**16.** The figures 263 and 40 appear in Model B of Table 2, which shows increases in numbers of black teachers at the rate of .5% per year, from 20.86 to 21.36 to 21.86 etc., as required by the final order.

level entail formidable administrative difficulties in view of the need to preserve the comprehensive character of programs which require staffing by teachers from more than 20 different certificated fields of specialization. In proposing to attain the 25% black faculty goal by 1988, the school defendants did not develop, or at least did not share with the court and the parties, any analysis of how the twin difficulties of faculty reduction and black teacher representation in the high schools would be resolved.

The final orders reinstate the January 28, 1975 order, suspended on June 2, 1981, that the school defendants actively recruit black applicants for faculty appointments until black teachers constitute 25% of the total faculty. The 1981 suspension expired when all tenured teachers discharged in 1981 had been recalled. The Boston Teachers Union (BTU) developed a "recall roster" in 1981, and for four years each qualified person on that roster has been given a chance to refuse acceptance of a faculty vacancy before it was offered to a new applicant. Not only have recallable teachers thus been canvassed repeatedly, but approximately two white teachers have been hired for every one black or other minority teacher over the period ending in June 1985. No teachers discharged in 1981 have been ignored when recall invitations have been extended, although many chose not to accept. Teachers' recall rights were expanded under the collective bargaining agreement between the BTU and school committee covering the three-year period beginning September 1, 1983. However,

the court's 1981 order was not thereby modified or extended.

The problems thus far described pertain only to black faculty, not to administrators, whose percentages according to the State Board report dated July 15, 1985 are for black principals 23.77% and black administrators 24.21%. The final order mandates an annual .5% increase in their number too, but no major problems are foreseen in this area.[17]

The final order also requires progress in the level of other minority faculty and staff. It adopts the goal of ten percent other minority administrators and the means for achieving it, established in the court's orders dated November 26, 1984 and July 5, 1985. Because the present level of other minority faculty, 8.74%, is not far below the goal of ten percent, and in order to permit its realization within the limits of average annual turnover of faculty, the minimum level of annual increase for this group is set at one-fourth of one percent per year.

The tables attached to the August 8, 1985 memorandum focused upon black faculty and therefore included other minority and white faculty under the heading "non-black". Having expanded paragraph (5) so as to include other minority faculty and administrative staff, the following table breaking out the numbers and percentages of each of the three groups, white, black, and other minority, becomes relevant. Note that, on the premises assumed, the faculty will be 25% black by 1993–94 and 10% other minority by 1990–91.

| Year | White | | | Black | | | Other Minority | | |
|---|---|---|---|---|---|---|---|---|---|
| | No. | % | Change | No. | % | Change | No. | % | Change |
| 1984–85 | 3111 | 70.40 | | 922 | 20.86 | | 386 | 8.74 | |
| 1985–86 | 3082 | 69.65 | −29 | 940 | 21.36 | +18 | 396 | 8.99 | +10 |
| 1986–87 | 2835 | 68.90 | −247 | 900 | 21.86 | −40 | 380 | 9.24 | −16 |
| 1987–88 | 2769 | 68.15 | −66 | 908 | 22.36 | +8 | 385 | 9.49 | +5 |
| 1988–89 | 2727 | 67.40 | −42 | 925 | 22.86 | +17 | 394 | 9.74 | +9 |
| 1989–90 | 2697 | 66.65 | −30 | 945 | 23.36 | +20 | 404 | 9.99 | +10 |
| 1990–91 | 2697 | 65.90 | 0 | 976 | 23.86 | +31 | 419 | 10.24 | +15 |
| 1991–92 | 2659 | 65.15 | −30 | 1024 | 24.36 | +48 | 432 | 10.49 | +13 |
| 1992–93 | 2665 | 64.40 | +6 | 1029 | 24.86 | +5 | 444 | 10.74 | +12 |
| 1993–94 | 2644 | 63.65 | −21 | 1053 | 25.36 | +24 | 457 | 10.99 | +13 |

17. The order for desegregation of administrative staff dated February 24, 1976, in para. 10, requires relatively even distribution of black administrators throughout the system.

### (6)

The final order is the same as the July 5, 1985 draft, to which no party objected. The requirement of "full access to computer facilities" is crucial.

### (7)

Referring again to the precedent established in Charlotte, North Carolina, the Boston case, too, "contains many orders of continuing effect, and could be reopened upon proper showing that those orders are not being observed.... The duty to comply with existing court orders respecting pupil assignment of course remains." *Swann v. Charlotte-Mecklenburg Board of Education, supra,* at 649.[18] On the other hand, such orders are relatively few in number. Since the court terminated its jurisdiction with respect to six subdivisions of the desegregation plan, there are no longer in this case any orders of continuing effect with respect to transportation, discipline, safety and security, special needs education, bilingual education and pairings of academic and business institutions.[19] In the five areas of continuing orders (student assignments, faculty desegregation, vocational education, facilities and parent councils) many orders previously issued have expired by their own terms, e.g., procedural orders and those of limited duration. The number of orders entered in this case that are no longer operative far exceeds the number that still are.

Paragraph (7) is open to the criticism, based upon Rule 65(d), Fed.R.Civ.P., that it omits specification of the orders that must be carried out. This deficiency is addressed in a procedural order entered contemporaneously herewith. Meanwhile they may be readily located either in State Board Report No. 5 dated July 15, 1985 or in this memorandum or in the memoranda and orders dated September 3, 1985. Unless an order has been referred to herein, it is safe to assume that it is no longer applicable.

### (8)

The procedure prescribed here applies only to the five areas of the case in which the court is retaining standby jurisdiction (student assignments, faculty desegregation, vocational education, facilities and parent councils) and, in those areas, only to orders that can be modified consistently with the provisions of paragraphs (1)–(6). For example, while jurisdiction over vocational education is retained, only the method of assigning students is permanent; other provisions of the UPV may be changed after notice and negotiations as provided in paragraph (8). For another example, the geocode method of assigning students to community district schools may be changed or eliminated after notice and negotiations as provided; but the enrollment guidelines specified in paragraph (3) may not be changed.[20]

The issue contested by the parties has been whether responsibility for proposing and making changes should be lodged solely with the school defendants. The court's resolution of this issue rests principally on the record of the school defendants during the past year when they have proved in many ways their commitment to desegregation and intention to complete implementation of the student desegregation plan.

---

**18.** The records of the Clerk of the United States Court for the Western District of North Carolina show that the *Swann* case has been dormant for ten years. Only once, about five years ago, did a party, the school defendant, apply for the modification of an order. Evidently some cases never die; they just fade away.

**19.** Also the remaining orders do not apply to the city and state defendants, except for those pertaining to the UFP.

**20.** Paragraphs (3) and (8) are mutually exclusive, i.e., should the school defendants decide to use the single citywide guideline for all student assignments, they would not be required to issue the public notice and conduct the negotiations described in paragraph (8).

The present school committee, with John A. Nucci as its president, has earned the confidence of other parties and of the court. It is evident that it understands that the remaining desegregation plan is an integrated one, i.e., that the orders still existing are interdependent. For instance, problems in the area of student assignments will probably disappear when special desegregation measures have been carried out and facilities have been renovated, but not until then.

The State Board has monitored compliance expertly and supported the Boston school department at every turn. A considerable amount of State Board monitoring will of course continue as required by state statute.[21] Now, however, there will be less need for involvement by the State Board in Boston public school affairs. Moreover, the State Board will itself be unable to give the same priority to school problems in Boston during the years to come as it has during the past decade. Implementation of the new state education reform legislation, chapter 188 of the Acts of 1985, will receive top priority at the State Board for the foreseeable future.

### Conclusion

The function of this memorandum has been to explain the derivation and purpose of the final orders entered on September 3, 1985, whose every paragraph incorporates a large measure of the parties' consent. The procedure for obtaining it followed a pattern established in these proceedings several years ago. On the basis of reports from Robert A. Dentler and Marvin B. Scott, the court-appointed experts, or from Martin A. Walsh, Regional Director of the Community Relations Service of the De-partment of Justice or from John P. Driscoll, Jr., Esquire, who served *pro bono* as the court's liaison to the academic and business communities, or a similar neutral source, the court would prepare and file a draft order believed to be supported by at least most of the parties. Time would be allowed for the parties' comments and objections and a hearing would be scheduled. After the hearing, a revised and refined draft might be issued as a court order. Thus, for example, the Draft Order Toward Closing Case issued on August 3, 1982 built directly on reports to the court regarding the progress of the consent decree negotiations [22] initiated in June, 1981 by Gregory R. Anrig, then Massachusetts Commissioner of Education; and they in turn led to the Orders of Disengagement dated December 23, 1982, pursuant to which the State Board filed its five monitoring reports.

The court's memorandum dated August 2, 1983 acknowledged the first State Board report as "a long step toward a common ground from which the parties can discuss and confront issues of compliance and non-compliance in an intelligent and informed fashion." The five State Board reports will remain an indispensable source of accurate information of what did and did not happen in the schools and in the case.

The memorandum's purpose has not been to set the record straight regarding the course of these proceedings generally or the current condition of the Boston public schools. A memorandum twice as long could be devoted to that endeavor, erroneous accounts having been published on every side. For example, an absolutely amazing article appears in the latest issue of New Perspectives, the quarterly journal published by the United States Commission on Civil Rights, nowadays known as the so-called Civil Rights Commission. Enti-

**21.** Mass.G.L. c. 15, § 1G provides that the State Board "shall see to it that all school committees comply with all laws relating to the operation of the public schools." The "laws" referred to would seem to include the State and Federal Constitutions, *Board of Education v. School Committee of Springfield,* 1976, 370 Mass. 37, 60 n. 27, 345 N.E.2d 345.

**22.** It is not beyond the realm of possibility that the final orders of September 3, 1985 might trigger a resumption of consent decree negotiations whereby all or portions of the final orders would become the final judgment in the case.

tled "Education by Decree", it frames and answers, with slight regard for the facts, the question "Why was desegregation in Boston such a self-defeating exercise?" and speaks of "massive chaos throughout the school system", "teacher strikes, student 'sick-outs,' and so many changes in pupil and teacher assignments that all sense of continuity and loyalty was obliterated", and "as late as 1982 ... still frequent racial skirmishes at South Boston and other schools". News media coverage, while excellent generally, was also sometimes woefully mistaken. However, whether the court placed the school system in receivership and controlled its daily operations and ordered school supplies and forced superintendents' resignations and blocked plans for the Latin School and issued so many other imaginary orders is unimportant now. As Emerson said, "History is all party pamphlets." What matters is that the final orders are another long step toward complete control and concomitant accountability of elected officials.

## PROCEDURAL ORDER

Referring to paragraph (7) of the Final Orders dated September 3, 1985, and the memorandum regarding that paragraph filed contemporaneously herewith, any party wishing a comprehensive compilation of still existing orders may obtain one by first drafting such a compilation, then serving it on other parties and filing it with the Clerk on or before November 20, 1985. Other parties may file comments or point out errors on or before November 27, 1985, after which the court will issue an official compilation.

## CITY DEFENDANT MOTION TO ENLARGE THE TIME FOR FILING NOTICE OF APPEAL

The city defendants move, pursuant to Fed.R.App.P. 4(a)(5), that this court enter an order extending the time the parties may file a notice of appeal as to all the orders entered on September 3, 1985 until December 3, 1985. In support of this motion, the city defendants state as follows:

1. The court initially enlarged the time to appeal until November 2, 1985 in part because it had not issued the forthcoming memorandum referred to in the September 3, 1985 orders. That memorandum has still not been issued by the district court and the city defendants believe that the parties should have an opportunity to review that memorandum before making a final decision on whether or not to appeal any of the September 3, 1985 orders.

2. On or about September 10, 1985, the city defendants filed a motion for modification of the September 3, 1985 UFP Orders. On October 17, 1985, the parties filed a letter containing the parties agreement with regard to the modification of paragraph 2(a) and 2(b) of that order. However, to date the district court has not acted on the pending motion. The city defendants believe that the parties should be afforded the opportunity to review the court's disposition of the pending motion before making a final decision on whether or not to appeal any of the September 3, 1985 orders.

GARRITY, District Judge.

11/1/85

Allowed to the extent of an enlargement until 11/29/85; and so ordered.