**Tallulah MORGAN, et al., Plaintiffs,**

v.

**Robert GITTENS** [1]**, et al., Defendants.**

**Civil Action No. 72–911–WAG.**

United States District Court, D. Massachusetts.

Jan. 31, 1996.

---

1. In keeping with practice, the named defendant is the Chairman of the Boston School Commit-

tee. Pursuant to Fed.R.Civ.P. 25(d)(1), defendant Gittens is substituted as the named defendant; and Mayor Thomas M. Menino and other successor municipal officers are automatically substituted as parties defendant.

Robert P. Pressman, Lexington, MA.

Thomas I. Atkins, Brooklyn, NY.

Matthew E. Dwyer, Dwyer & Jenkins, Boston, MA.

Rhoda E. Schneider, Mass. Dept. of Education, Malden, MA.

Henry C. Dinger, Goodwin, Procter & Hoar, Boston, MA.

Linda Walsh, Boston School Department, Boston, MA.

Douglas H. Wilkins, Assistant Attorney General, Boston, MA.

Steven P. Perlmutter, Robinson & Cole, Boston, MA.

Caroline B. Playter, Kehoe, Doyle, Playter & Novick, Boston, MA.

Richard W. Coleman, Segal, Roitman & Coleman, Boston, MA.

Martin Walsh, Regional Director, Community Relations Services, Department of Justice, Boston, MA.

## MEMORANDUM OF DECISION AS TO ATTORNEYS' FEES

GARRITY, District Judge.

As noted in the Final Judgment and the Final Judgment as Amended,[2] the Court has under advisement plaintiffs' applications for awards of attorneys' fees and expenses pursuant to 42 U.S.C. § 1988. In November 1988 Attorneys Atkins and Pressman were awarded compensation for services and expenses through December 14, 1988 and October 5, 1988 respectively, Atkins by court order and Pressman by agreement with defendant. Since then plaintiffs have filed a series of applications, initially in December 1989, followed by several supplements[3] covering services and expenses of Atkins and services of Pressman through the summer of 1993. They have not sought compensation for time spent thereafter on miscellaneous matters and preparing further memoranda.[4] Defendant City of Boston has responded to each of plaintiffs' applications, contesting their right to any awards at all and raising several particular objections.

The Court heard oral argument on April 18, 1990 and has received voluminous supporting materials, including comprehensive, detailed and contemporaneous records of time spent and expenditures incurred; affidavits of the applicants stating their general qualifications and describing particular services in the instant case; affidavits of members of the bar of this court attesting to the

reasonableness of the hourly rates charged; reports in legal publications as to fees customarily charged in 1989 by lawyers in law firms in Boston and elsewhere; and transcripts of prior proceedings in this case.[5] In ruling upon the pending applications, the Court has analyzed a small mountain of filings which might in other contexts be overkill—but not here because the events to which the services of counsel relate are long past and had to be reconstructed.

## OVERVIEW OF APPLICATIONS

Thomas I. Atkins, Esquire, is in private practice specializing in civil rights litigation, particularly school desegregation cases, with offices in Brooklyn, New York. Due to his scholarship and long specialized experience, Mr. Atkins is in a class by himself representing plaintiffs in this type of litigation. Before moving to the national scene, he was active in Boston civic affairs since his days at Harvard Law School. For example, he was elected as a city councillor for two terms, and learned of the City's racial tensions first hand.

Robert Pressman, Esquire, has comparable credentials, outlined in his affidavit filed with plaintiffs' application dated January 24, 1990. Following five years with the Civil Rights Division of the Department of Justice, he came in 1970 to the Center for Law and Education in Cambridge, a national support center for the entire legal services program on education issues. Mr. Pressman has tried school desegregation cases in a dozen federal district courts, argued appeals in several federal circuits and been a principal contributor for two years to the Education Law Bulletin. Of all the attorneys who have filed appearances for various parties to these proceedings, who probably number in the thirties, he

---

2. Between May 1990 and July 1994, judgment was amended thrice by this Court, on September 19, 1990, June 21, 1991, and July 30, 1993, and once on February 21, 1991 by the Court of Appeals.

3. Precise dates are omitted partly because unnecessary since they appear on related exhibits and because there are small differences in the filing dates and periods covered by plaintiffs' separate applications and supplements for services.

4. Plaintiffs' last memorandum was filed on June 1, 1995 to which defendants replied on June 16, 1995.

5. Especially relevant is the Court's appraisal at a November 15, 1988 hearing of Attorney Atkins' extraordinary qualifications as counsel for plaintiff class.

is the only one who was with the case since its inception, attending more hearings and submitting more briefs than any other lawyer. Being an employee of the Center, the Court's award to plaintiffs for his services will go to the Law and Education Center, Inc.

Total compensation sought by plaintiffs for Atkins' services is $129,123 plus reimbursement of expenses amounting to $3,162.69, and for Pressman $109,311 for services with no claim for expenses. The application for Atkins is predicated on an hourly rate of $300, and for Pressman a rate of $200. Both applications are approximately $18,000 greater than those submitted on August 27, 1993 for such services and expenses. At that time, as shown in the following tables of applications filed on the dates and covering the time periods specified, hourly rates charged by Atkins increased from $240 in 1988 to $300 in 1991; and by Pressman from $140 in 1988 to $200 in 1991.[6] Plaintiffs are now seeking awards for the first three years, 1988–91, at rates which their attorneys began charging in 1991.

## ATKINS' PERIODIC APPLICATIONS

| PERIOD COVERED | HOURS | RATE | FEES | COSTS | TOTALS | SUBMITTED |
|---|---|---|---|---|---|---|
| 12/15/88–12/16/89 | 239 | 240/hr | 57,360.00 | 2,134.41 | 59,494.41 | 1/24/90 |
| 1/3/90–4/30/90 | 4.5 | 265/hr | 12,852.50 | 192.70 | 13,045.20 | 4/30/90 |
| 5/1/90–5/18/90 | 23.25 | 265/hr | 6,161.25 | n.a. | 6,161.25 | 5/18/90 |
| 5/19/90–5/21/90 | 21.00 | 265/hr | 5,565.00 | 308.70 | 5,873.70 | 6/6/90 |
| 5/30/90–4/2/91 | 17.75 | 265/hr | 4,703.75 | n.a. | 2,928.75 | 4/8/91 |
| 9/26/90–12/4/90 | 7.50 | 265/hr | 1,987.50 | n.a. | 1,987.50 | 4/8/91 |
| 4/15/91–8/24/93 | 73.41 | 300/hr | 22,023.00 | 526.88 | 22,549.88 | 8/24/93 |
| TOTALS: | 430.41 | | 110,653.00 | 3,162.69 | 113,815.69 | |

## PRESSMAN'S PERIODIC APPLICATIONS

| AFFIDAVIT DATE | DATES OF WORK | HOURS | RATE | TOTAL |
|---|---|---|---|---|
| 12/29/89 | 10/6/88–12/29/88 | 12.40 | $140 | $ 1,736.00 |
| 4/9/90 | 1/13/89–12/28/89 | 211.77 | $160 | $33,883.20 |
| 5/18/90 | 1/2/90–5/18/90 | 114.23 | $160 | $18,276.80 |
| 4/3/91 | 7/3/90–4/1/91 | 83.15 | $160 | $13,304.00 |
| 10/28/93 | 4/11/91–6/28/93 | | | |
| | –50% of hours | 62.50 | $180 | $11,250.00 |
| | –50% of hours | 62.50 | $200 | $12,500.00 |
| | TOTAL HOURS: | 546.55 | AMOUNT: | $90,950.00 |

Fees claimed in these periodic filings totalled $201,603; fees now sought total $238,434, an increase of $36,831. Expenses of $3,162.69,[7] all incurred by Atkins, remain the same.

Without waiving explicitly a general objection to the Court's continuing jurisdiction to award fees under § 1988, defendants have modified their position regarding reasonable hourly rates for services of plaintiffs' attorneys. In two oppositions filed in April, 1990, they first contended that maximum hourly rates for Atkins' services should be $140 and

---

6. A third set of periodic applications was received from plaintiff intervenors El Comite de Padres Pro Defensa de la Educacion Bilinque, capably represented in these proceedings for two decades by Attorney Caroline B. Playter of Boston. Ms. Playter's hourly charges increased from $125 to $140 in 1990, and her reapplication filed in 1995 was based upon a current hourly

rate of $175. As occurred with all previous applications by El Comite de Padres, its final one was settled.

7. Defendants' initial objection to this item was waived at page 10 of their memorandum filed December 13, 1993.

$90 for Pressman. The second opposition increased these figures to $200 and $140 respectively; but argued that roughly two-thirds of the applicants' services should be classified as "non-core" and compensated at the lower hourly rates of $160 and $100 respectively. A later defendants' memorandum in opposition filed in December 1993, applicable to services after April 11, 1991, agrees to increased hourly rates of $300 and $190 for core work[8] but suggests $190 and $120 for non-core, respectively. Total fees proposed by defendants in their December 13, 1993 memorandum in opposition, without waiving substantive objections, are $56,674.15 for Atkins and $50,372.20 for Pressman, a total of $107,046.35. Costs of $3,162.69 incurred by Atkins have not been reduced by defendants in relation to fee reductions.

## Historical Background

Consideration of the merits of plaintiffs' pending applications requires an understanding of the relevant history of these proceedings. It is recounted in detail in *Morgan v. Nucci*, 620 F.Supp. 214, 217–218 (D.Mass. 1985), and *Morgan v. Nucci*, 831 F.2d 313, 315–17 (1st Cir.1987), and shows how the Court's remedial orders were lifted incrementally, a procedure later endorsed in *Freeman v. Pitts*, 503 U.S. 467, 489, 112 S.Ct. 1430, 1444–45, 118 L.Ed.2d 108 (1992). The case was closed, except for the pending applications, in similar incremental fashion by so-called Final Orders dated September 3, 1985 (attached as Appendix A), Final Judgment dated May 31, 1990, Amended Final Judgments dated September 19, 1990 and June 21, 1991 and Final Judgment as Amended dated July 19, 1994. An important closing order, vacating the Court's injunctive orders which had governed the student assignment process, was also issued by the Court of Appeals on September 28, 1987. *See* 831 F.2d at 326.

Thereupon, the Defendant Mayor hired two consultants, Michael Alves and Charles Willie[9], to develop a new student assignment plan. After several months of consultations and hearings, the consultants in December 1988 proposed a plan to the Boston School Committee ("BSC") which approved its general framework on December 28, 1988. Following a public hearing on February 14, 1989, the Committee, on February 27, 1989, voted to adopt the plan subject to further modification arising out of the 90–day process ordered in paragraph 8 of the Court's 1985 final orders. The State Board convened eleven negotiating sessions, in which plaintiffs' counsel participated fully, which proposed numerous changes which were eventually adopted in April 1989 by the School Committee. Called the Controlled Choice Plan ("CCP"), it was scheduled for implementation at entry elementary grades in September 1989 (Phase I) and systemwide in September 1990 (Phase II); meanwhile the Court plan would continue in effect.

Dissatisfied with some aspects of the CCP, and seeking more time for further study and amendments, plaintiffs moved for an injunction against its implementation on the ground that it would tend to resegregate the schools. After hearings on May 26, 30 and 31, 1989, the Court denied plaintiffs' motion, and Phase I of the CCP went into effect in September. In December the Committee again directed its general counsel "to initiate the 90–day process required for modification of orders in *Morgan v. O'Reilly* so that the second phase of the new Student Assignment Plan adopted herewith may be implemented"; and again plaintiffs' counsel participated actively. Roughly 55% of counsels' services covered by the pending applications (532 hours out of a total of 977) pertains either directly or indirectly to the CCP.

Another segment of plaintiffs' applications to which defendants are objecting on legal grounds is hours spent counteracting the efforts of the Boston Teachers Union ("BTU") to eliminate and then overturn on appeal

---

8. These were merely token concessions, however, since they pertained to only 4.5 hours of 96 hours claimed by Atkins during a period of more than two years; and to only 24 hours of the 115 hours claimed by Pressman during the same period.

9. Both were closely associated with the Court's plan, Alves as Project Director for Boston Desegregation Assistance at the State Board, and Willie as one of the four Masters who designed the plan adopted by the Court in 1975.

paragraph (3) of the Final Judgment dated May 31, 1990, entitled "Faculty and Staffing." The legal point now alleged by the defendants is that time spent defending against an intervenor's claim, which was also resisted by the BSC, is not properly chargeable against the BSC and City defendants.

### Undisputed Areas

Defendants have not questioned several essential components of plaintiffs' overall burden of proving their entitlement to attorneys' fees and expenses during the winddown phase of these proceedings. The first is plaintiffs' having prevailed in demonstrating pervasive *de jure* segregation in Boston public schools and obtaining numerous far-ranging remedial orders, nearly all affirmed by the Court of Appeals and left in place by Supreme Court denials of *certiorari*. Nor have defendants challenged the inter-relationship between the hours for which compensation is now sought and the several claims as to which plaintiffs gained complete success. *See Lipsett v. Blanco*, 975 F.2d 934, 940–41 (1st Cir.1992).

Also undisputed are the hours that plaintiffs' attorneys claimed that they worked, the adequacy of their descriptions of services performed, and the contemporaneity of their diary entries. Clearly they met the record-keeping requirements ordered in *Grendel's Den, Inc. v. Larkin*, 749 F.2d 945, 952 (1st Cir.1984). It is clear too that Atkins and Pressman exercised sound billing judgment. There was virtually [10] no duplication of services; e.g., it is apparent from an exhibit filed with plaintiffs' first supplemental application that, of the 33 meetings and four days of hearings attended by plaintiffs' counsel pertaining to the Controlled Choice Plan, plaintiffs' attorneys attended together only two of them. It is also apparent that work on behalf of plaintiffs' interests was divided so as to avoid duplication. All hours claimed were worked by Atkins and Pressman personally; none was referred to paralegals or associate counsel, any of whom would have required time-consuming orientation and in-troduction to the complex, even arcane, issues with which plaintiffs' attorneys had become intimately familiar. Since his office was out of state, Atkins did not charge for time spent traveling to and from Boston.

In sum, plaintiffs have made a strong *prima facie* showing of entitlement to the award of fees and expenses sought in the pending applications. It behooves them to show further that the hours claimed were reasonably spent and that their claimed hourly rates of compensation are reasonable. *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983); *Blum v. Stenson*, 465 U.S. 886, 895, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984). These essential elements of plaintiffs' applications are disputed by defendants on grounds which we now address.

### DEFENDANTS' OBJECTIONS

■ As heretofore noted, most of counsels' services for which plaintiffs now seek compensation related to the Controlled Choice Plan. Of such CCP services, three-fourths comprised their participation in 90–day sessions concerning Phases I and II or in 90–day subcommittee work, and the balance pertained to plaintiffs' unsuccessful attempt, by motion for a preliminary injunction denied May 31, 1989, to delay implementation of the CCP until 1990. Defendants' central objection to an award for such services rests on the above-mentioned 1987 Court of Appeals decision vacating the Court's orders pertaining to student assignments; and our award of fees for such services reflects our understanding of the relationship of the appellate court's order to provisions of the 1985 Final Orders not appealed from. In the defendants' view, after September 25, 1987, "plaintiffs no longer had either the status of 'prevailing' parties on the issue of student assignments or the authority to monitor or review the school defendants' actions in developing and implementing the new plan."

On the contrary, we find that the Court of Appeals ruling did not nullify any rights of

---

**10.** Agreement on this point is qualified by defendants' contention, addressed *post*, that charges by Pressman for conferring with Atkins should be disallowed because they are "duplicative legal services."

the plaintiff class or deprive it of the victory it had achieved in the area of student assignments. Rather it reaffirmed plaintiffs' entitlement to the non-discriminatory treatment that they had received under the Court plan. It was aimed not at the plaintiffs, but at the lower court, which should no longer "continue to involve itself" in student assignments. The appellate decision did not affect paragraphs of the Final Orders on the unified facilities plan, parent councils, and faculty and staff. Nor did it disturb provisions of the Final Orders not appealed from, including the permanent injunction in Paragraph (2) and the detailed consent mechanism contained in paragraph (8) for the gradual transfer to the defendants of general responsibility for managing its schools, a transition begun with disengagement orders in 1982 and advanced by orders in 1984 and 1985 terminating the Court's jurisdiction in several areas of school administration. At every turn, starting with negotiations initiated by the State Board in June 1981 aimed at fashioning a comprehensive consent decree,[11] never achieved, the Court relied upon the cooperation and, where obtainable, the collaboration of the defendants.

 Thus it came as no surprise that the school defendants, after September 25, 1987, resorted to the paragraph (8) procedures of the Final Orders to facilitate their development and implementation of the CCP, sometimes called the Alves–Willie Plan, aptly described by them as representing "an evolution, not a counterrevolution." Until the opening of the 1989–90 school year, the defendants continued to comply with the Court plan and, except for entry elementary grades, did so until September 1990, three years after the Court of Appeals mandate. Plaintiffs' counsel participated fully and constructively in the development of the CCP, not as strangers or volunteers, as defense

counsel has suggested in opposing an award of fees, but at the repeated request of the defendants. The details of their services in this regard are set forth in affidavits appended to plaintiffs' applications.

Generally speaking, as soon as an executive summary of the proposed new Plan was available on February 9, 1989, BSC's general counsel mailed copies to parties to the paragraph (8) 90–day process, including plaintiffs, with an assurance that they would receive complete copies when available. Promptly, on February 13, Atkins and Pressman replied with a five-page letter, copied to counsel for other 90–day process parties, raising various issues for discussion, including facilities and programs, seat allocations, transfers of students on the waiting list and opportunities for black pupils to attend school in East Boston. All these and other issues raised in plaintiffs' letter were agenda items at several meetings moderated by the State Board.[12] Three series of 90–day process meetings were convened, all at the request of the school defendants, as follows: on February 27, 1989, the Boston School Committee approved the following order:

> ORDERED, That the School Committee approve the Controlled Choice Student Assignment Plan submitted on December 28, 1988 and amended by the School Committee on February 7, 1989 and February 27, 1989, and authorize the School Department to undertake the necessary preparations for implementation of the plan, subject to further modification *pursuant to the procedures set forth in paragraph 8* of the Final Orders in Morgan v. O'Reilly. (emphasis added)

On July 26, 1989, BSC General Counsel asked State Board counsel to convene a 90–day process to consider a package of school closings and consolidations, stating in part:

11. The Court's memorandum dated August 2, 1983 acknowledged the first State Board monitoring report as "a long step toward a *common ground* from which the parties can discuss and confront issues of compliance and non-compliance in an intelligent and informed fashion." (emphasis added)

12. Former Superintendent Wilson's affidavit dated May 25, 1989 stated, at paragraph 15: "During February and March and April, my staff brought to my attention numerous additional concerns and recommendations for changes in the Plan raised during the course of the paragraph 8 proceedings. I considered them carefully and recommended to the Committee that it approve a number of amendments to the Plan based on those recommendations."

If you believe that these closings and consolidations conflict with any operative Court orders, *the school defendants ask you to determine, pursuant to paragraph 8,* that these closings and consolidations are emergency matters, due to the budget crisis, which the School Committee may adopt without negotiation or that these closings and consolidations effect insubstantial modifications of court orders and therefore need not be negotiated. If you determine that negotiations are required, we would appreciate your convening the parties immediately and attempting to expedite negotiations so that these closings and consolidations may be implemented in September 1989. (emphasis added)

On December 12, 1989, the BSC adopted the following motion (12 affirmative, 1 absent):

Resolved that the School Committee direct their Office of General Counsel to initiate *the 90–day process required for modification of orders* in Morgan vs. O'Reilly, so that the second phase of the new Student Assignment Plan adopted herewith may be implemented. (emphasis added)

Continuing reliance by the BSC on the assistance of plaintiffs' attorneys regarding student assignments was demonstrated repeatedly during the development of the CCP. For example, in April 1989, the BSC established a three-member independent commission to review the pattern of actual assignments made for the 1989–90 school year, to be composed of one member appointed jointly by the City and the School Department, one member appointed by the plaintiffs, and one member appointed by the State Board of Education. By letter dated August 28, 1989, plaintiffs indicated that Pressman would be their representative. For another, early in 1989 the BSC appointed a High School Student Assignment Subcommittee chaired by member Rosina T. ("Kitty") Bowman, to recommend development of a viable assignment plan for high school students. Plaintiffs designated Pressman to be their representative on the "Bowman Subcommittee" and, on this assignment, he spent 17.5 hours attending eight subcommittee meetings from October 30, 1989 through February 5, 1990.

The collaborative relationship between plaintiffs' counsel and the BSC extended to implementation of the CCP and carried forward until the end of 1992. For example, on March 11, 1992, school committee counsel wrote to plaintiffs, in pertinent part as follows:

Enclosed are several documents related to the proposed modifications to the Student Assignment Plan. The School Committee adopted the proposal (Attachment 1) conditioned upon satisfactory discussions among the parties.

For another, on November 23, 1992, Pressman made a presentation to a BSC subcommittee at English High School with respect to proposed policy changes in the student assignment plan.

We find that all the hours spent by Atkins and Pressman preparing and presenting proposals to other participants in the 90–day process negotiations and attending all 90–day process meetings and in related studies, consultations and presentations are compensable under § 1988. Several legal theories support this award. One is *quantum merrit:* the defendants invited counsel's participation and benefitted substantially from it in a context where it knew that plaintiffs' had received from defendants prior awards of attorneys' fees in the same litigation, that they had applied for and expected to receive further awards and that plaintiffs' counsel rendered their services in good faith. *See Newfield House, Inc. v. Massachusetts Dept. of Public Welfare,* 651 F.2d 32, 38 (1st Cir.), *cert. denied,* 454 U.S. 1114, 102 S.Ct. 690, 70 L.Ed.2d 653 (1981); *see also Transnational Corp. v. Rodio & Ursillo, Ltd.,* 920 F.2d 1066, 1070–71 (1st Cir.1990). Another is that the 90–day process was, from plaintiffs' standpoint and interests, the equivalent of the further hearing authorized by the Court of Appeals in its September 25, 1987 decision, *see,* 831 F.2d at 326, except that plaintiffs' submissions were addressed to the school defendants rather than to the District Court, and except further that plaintiffs' submissions were not limited to student assignments but pertained also to other matters such as the condition and consolidation of schools, availability of textbooks, proposals of

parent groups, etc. It was also in the nature of reasonable post-judgment monitoring, *see Brewster v. Dukakis,* 786 F.2d 16, 19 (1st Cir.1986); *Garrity v. Sununu,* 752 F.2d 727, 738–39 (1st Cir.1984), whereby plaintiffs sought and obtained assurance that the desegregation already achieved did not unravel to their disadvantage.

### Failure to Enjoin CCP

■ Plaintiffs' application regarding services in connection with their unsuccessful attempt by motion filed May 15, 1989 to enjoin establishment of the CCP rests also on an additional basis: defendants' obligation under paragraph (2) of the Final Orders and 42 U.S.C. § 1983 generally to avoid resegregation of Boston's public schools. Plaintiffs contend that some of the CCP's provisions were objectionable on those grounds and that their efforts to change or eliminate objectionable provisions met with substantial if partial success. Plaintiffs point to various revisions in the new Plan made by defendants which had the effect of blunting plaintiffs' objections prior to the Court hearings on their motion. For example, the BSC modified a formula objectionable to plaintiffs for calculating relevant zone racial-ethnic percentages so as to exclude from the calculation students unavailable for assignment to zone schools. For another, the CCP as drafted would have reduced desegregation in East Boston, until the BSC approved a proposal by plaintiffs to permit black students from outside the North Zone to attend schools in East Boston on a space-available basis. On the other hand, plaintiffs' proof of likely resegregation fell short of demonstrating irreparable harm to the plaintiff class or an intent by defendants to turn back the clock to the era of *de jure* segregation. Quite the opposite: defendants' acceptance of changes sought by plaintiffs, together with other evidence, satisfied the Court that defendants' good faith in promoting desegregation remained strong. Hence *plaintiffs' motion for an injunction was denied.*

Should plaintiffs nevertheless recover fees for time spent by their attorneys (totalling 114.83 hours) preparing and arguing their motion for an injunction? Yes, in our opinion, principally because the claims presented in plaintiffs' motion were essentially an extension of claims they had been advocating throughout the previous decade and were interconnected with claims as to which plaintiffs prevailed. The law in this area has been well settled since first explicated in *Hensley,* 461 U.S. 424, 103 S.Ct. 1933. It has been construed repeatedly in cases in this circuit. *See, e.g., Lipsett,* 975 F.2d at 940–41; *Exeter–West Greenwich Regional School Dist. v. Pontarelli,* 788 F.2d 47 (1st Cir.1986); *Aubin v. Fudala,* 782 F.2d 287 (1st Cir.1986). Where claims presented by plaintiffs in a civil rights suit are related and plaintiffs have won substantial relief, attorneys fees under § 1988 should not be reduced because of a discrete unsuccessful claim by plaintiffs. In the instant case, plaintiffs obtained virtually all the equitable relief they sought, including the establishment of a successor desegregation plan, the CCP, which preserved and built upon desegregation gains theretofore achieved.

Plaintiffs' motion to enjoin the CCP did not seek to block its eventual implementation. Rather it was in the nature of a continuation of their participation in the 90–day process. In support of their motion, plaintiffs argued that the CCP endeavored to achieve too much too soon and that its implementation should be delayed. The Court's denial of plaintiffs' motion was by no means a permanent set back. As shown by BSC votes quoted *ante,* plaintiffs' negotiating role in the development and implementation of the CCP continued for more than two years after denial of plaintiffs' motion.

The court finds abundant interrelatedness and interconnection between plaintiffs' successful advocacy subsequent to their achieving unitariness with respect to student assignments and their unsuccessful effort to enjoin the CCP. Hence plaintiffs' attorneys' services in preparing and arguing the motion are generally compensable under § 1988. It remains for us to consider, and we do *post,* the impact of plaintiffs' failure to enjoin on the "level of success", *Hensley,* 461 U.S. at 434, 103 S.Ct. at 1939–40, achieved by them in this litigation, and also "the relationship between the amount of the fee awarded and

the results obtained." *Id.* at 437, 103 S.Ct. at 1941.

### The BTU Appeal

■ We turn now to plaintiffs' claim for fees incurred in opposing an appeal by intervenor Boston Teachers Union ("BTU"), which challenged paragraph 3 of the 1990 Final Judgment concerning desegregation of faculty and administrative staff. In particular BTU opposed paragraph 3 as too indefinite in duration, arguing against a formula contained therein which was designed to protect against faculty and staff resegregation. Presumably plaintiffs are entitled to reasonable fees for their attorneys' services (consuming 110.75 hours) under general principles enunciated in *Hensley,* 461 U.S. at 429, 103 S.Ct. at 1937, and *Blanchard v. Bergeron,* 489 U.S. 87, 89 n. 1, 109 S.Ct. 939, 942 n. 1, 103 L.Ed.2d 67 (1989); *see also deJesus v. Banco Popular de Puerto Rico,* 918 F.2d 232, 234 (1st Cir.1990); to wit, that plaintiffs who prevail on § 1983 claims deserve reasonable attorneys' fees under § 1988 unless "special circumstances" render such an award inequitable. Defendants contend that two such special circumstances should bar an award to plaintiff for the services at issue: first, plaintiffs were not a prevailing party as against the defendants on the appeal but as against an intervenor; and second, the defendants also successfully opposed the BTU appeal, rendering plaintiffs' brief and oral argument unnecessary.

There is no controlling precedent "on all fours" with the pending issue. Both parties find support from dicta in *Independent Fed'n of Flight Attendants v. Zipes,* 491 U.S. 754, 109 S.Ct. 2732, 105 L.Ed.2d 639 (1989); but *Zipes* was a class action involving discrimination in employment in which the trial judge awarded fees against an intervenor which had not harmed the plaintiff class. The Supreme Court reversed, holding that attorneys' fees are recoverable against a losing intervenor only if "the intervenors' action was frivolous, unreasonable, or without foun-

dation." *Id.* at 761, 109 S.Ct. at 2737.[13] The Court of Appeals for the First Circuit has not yet had occasion to analyze *Zipes* within the context presented. Three circuits have, however. *See Rum Creek Coal Sales, Inc. v. Caperton,* 31 F.3d 169, 176–78 (4th Cir.1994); *Jenkins v. Missouri,* 967 F.2d 1248, 1250–52 (8th Cir.1992); *Bigby v. City of Chicago,* 927 F.2d 1426, 1428–29 (7th Cir.1991). The *Jenkins* decision is the only one known to us discussing *Zipes* in the context of school desegregation litigation.

We shall resist the temptation to essay an ambitious disquisition on the opinions of the Justices in *Zipes.* Suffice it to say that we adopt the *Jenkins* approach, *viz.,* that "the *Zipes* Court's balancing of the equities involved in Title VII litigation guides us in determining who should bear liability for the fees in this desegregation litigation." *Id.* at 1251. Factors favoring an award to plaintiffs include the following:

1) Defendants engaged for decades in deliberate racial segregation of faculty and administrative staff without opposition from the BTU.

2) Plaintiffs were prevailing parties against the defendants in a series of appeals[14] concerning faculty and staff desegregation.

3) Plaintiffs participated from the outset in the development of paragraph 3 governing faculty desegregation, including the novel formula affirmed by the Court of Appeals in *Morgan v. Burke,* 926 F.2d 86 (1st Cir.1991), and regarding which a petition for a writ of *certiorari* was denied on April 20, 1992.

4) Unlike typical plaintiff classes in Title VII cases, which usually benefit financially from a successful lawsuit and sometimes, as in the *Rum Creek Coal* case, *see* 31 F.3d at 181, have ample resources with which to compensate their attorneys, plaintiffs in the case at bar have sought only injunctive relief

---

13. In the instant case, no such basis existed for an award of plaintiffs' fees against intervenor BTU and plaintiffs have not sought one. BTU's appeal reasonably raised substantial legal questions.

14. To the best of our knowledge the number of appeals from various orders entered in the *Morgan* litigation is 17.

of no monetary value and presumably have meager financial resources.[15]

Factors militating against an award for opposing BTU's appeal include:

1) Defendants abandoned their resistance to desegregation long before the appeal in question and generally cooperated with the plaintiffs and the Court in resisting resegregation.

2) Unlike the state defendants in *Jenkins,* the defendants in the instant case participated fully in the BTU appeal, presenting oral argument in addition to plaintiffs'.

3) The important tasks of implementing the paragraph 3 orders and predecessor orders as to faculty and administrative staff and of dealing directly with BTU fell upon defendants, who performed conscientiously.

After a review of the history of faculty and staff desegregation in Boston, the roadblocks overcome by plaintiffs, the eventual conversion to genuine desegregation by the defendants, and the issues involved in the BTU appeal in question, it is our judgment that the relevant equities, general and particular, balance evenly. Hence plaintiffs are awarded 50% of the reasonable fees incurred in their opposing the final BTU appeal.

### Failure to Reopen in 1993

In April 1991 plaintiffs filed a petition to reopen the case for the limited purposes of removing an impediment to faculty desegregation and requiring that annual funding of school maintenance be increased to the level of $13,500,000 ordered in the Final Judgment dated May 31, 1990. After full briefing and a hearing on April 26, the Court granted the petition, reopened the case for one month and entered limited remedial orders by memorandum issued May 6. Applicants' affidavits show roughly 55 hours spent on this matter, and defendants have not opposed their recovering fees for these services, presumably because they constitute reasonable monitoring of previous orders.

We have mentioned *ante* the continuation of the collaborative relationship between the applicants and the BSC during 1992. To some extent it continued in 1993. For example, on March 24, 1993 the BSC passed a resolution to modify the CCP so that students on waiting lists at schools with vacant seats might transfer "without regard to race, to the extent that such action does not violate the Federal District Court's final orders in the *Morgan* case." Plaintiffs' counsel advocated against the announced policy, and it was not implemented. Pressman spent 1.5 hours on this matter and defendants have not objected to plaintiffs' recovering his fees for these services.

■ On May 7, 1993, plaintiffs again sought to reopen the case by emergency motion alleging serious problems of student safety at and *en route* to South Boston High School. Affidavits and briefs were filed and a hearing was held on June 28. Before the June 28 hearing date, the problems were addressed by the defendants and the safety crisis passed. Meanwhile, however, in a filing on June 17, plaintiffs sought the formulation and submission by defendants for *in camera* Court review of Boston police department safety plans for South Boston High School for the 1993–94 school year. At the hearing on June 28, the Court denied plaintiffs' motion to reopen the case but ordered the filing of the safety plans requested by plaintiffs. Although applicants spent 35 hours on this matter, defendants contend that their related fees are "not recoverable" because the Court refused to reopen the case. Defendants' argument is as follows:

> The only action taken by the court relative to the South Boston issue was to direct the City to submit the Police Safety Plan. That direction from the Court does not entitle the plaintiffs to consider themselves as "prevailing". Therefore, neither Attorney Atkins nor Attorney Pressman should be compensated for his efforts.

In this instance, as with plaintiffs' counsels' unsuccessful efforts to delay implementation of the CCP, discussed *ante,* the defendants' stance in responding to plaintiffs' applica-

---

**15.** As stated in *Jenkins,* 967 F.2d at 1251: "[G]iven the special nature of desegregation cases, withholding from the plaintiffs the means for paying their attorneys could be devastating to the national policy of enforcing civil rights laws through the use of private attorneys general."

tions for fees seems to be that plaintiffs risked their status as prevailing parties every time they filed a motion. Again we disagree. The threat to peaceful desegregation arising from the events at South Boston High School toward the end of the 1992–93 school year was immeasurably greater than the problems with faculty desegregation and maintenance funding in 1991, or with the wait-listed students earlier in 1993. Plaintiffs' emergency motion and its disposition were, in our view, a classic example of reasonable monitoring and advocacy for the benefit of the plaintiff class. As explained in *Maher v. Gagne*, 448 U.S. 122, 129, 100 S.Ct. 2570, 2574, 65 L.Ed.2d 653 (1980):

> The fact that respondent prevailed through a settlement rather than through litigation does not weaken her claim to fees. Nothing in the language of § 1988 conditions the District Court's power to award fees on full litigation of the issues or on a judicial determination that the plaintiff's rights have been violated.

### Consultations With Co–Counsel

■ A final, relatively minor dispute regarding services for which plaintiffs seek compensation pertains to time spent by Atkins and Pressman conferring with each other either in person or by telephone. Defendants argue that plaintiffs' claim for such services should be disallowed on the ground that they were unnecessary and duplicative.

Consultations on twelve different dates, totalling between five and six hours, were recorded by Pressman. Contrary to defendants' contention, we find that this time is compensable. As noted *ante* in the Undisputed Areas section, plaintiffs' counsel took pains to minimize duplication of services. Their customary procedure of working independently and personally rather than with junior associates, as often occurs in class action cases, necessitated an occasional exchange of information and strategy. *See Boston and Maine Corp. v. Moore*, 776 F.2d

2, 9 (1st Cir.1985), (discussing "time spent reporting on events to co-counsel"). The hourly rate at which such services are compensable may be a different question.

### LODESTAR COMPONENT

Resolution *ante* of defendants' objections to plaintiffs' entitlement to compensation for various kinds of work done by their attorneys paves the way for the Court's ruling directly on the merits of plaintiffs' applications. The proper method is well-established, *see Bordanaro v. McLeod*, 871 F.2d 1151, 1167 (1st Cir.), *cert. denied*, 493 U.S. 820, 110 S.Ct. 75, 107 L.Ed.2d 42 (1989); *Miles v. Sampson*, 675 F.2d 5, 8 (1st Cir.1982), and in this case will require four steps. Steps one and two will be calculation of the number of hours reasonably spent by Atkins and Pressman multiplied by appropriate hourly rates of compensation, producing a so-called "lodestar" component. Step three will be adjustment of the lodestar up or down to reflect factors which have not already been taken into account and which are shown to warrant the adjustment by the party proposing it. The fourth and final step will be consideration of the applicants' level of success as explained in *Hensley*, 461 U.S. at 437, 103 S.Ct. at 1941, and *Gabriele v. Southworth*, 712 F.2d 1505, 1507 (1st Cir.1983).

With the modification hereinafter described, we find that the hours recorded in counsels' diary entries were reasonably spent in bringing this litigation to a successful conclusion. Defendants seem to believe that the case ended in 1987, when the Court of Appeals vacated the District Court's jurisdiction over student assignments, or even earlier, on September 3, 1985, when Final Orders were entered.[16] But the record indicates that defendants' belief surfaced when the time arrived to close their accounts with plaintiffs' attorneys. While benefitting from plaintiffs' collaboration and responding to plaintiffs' motions on the merits, defendants never

---

**16.** Defendants' initial memorandum in opposition to plaintiffs' applications, filed April 2, 1990, states in footnote (1):

> Over the lifetime of this case both the City and school defendants have paid over $1.5 million in attorneys' fees. Plaintiffs' instant application requesting another $95,000 for fees and costs allegedly expended over a one-year period is particularly disturbing since this case was "closed" and removed from this Court's active docket five years ago.

treated them as supernumeraries nor their attorneys as volunteers. We have explained *ante* our findings regarding segments of services targeted explicitly by defendants' objections: time spent on evaluation and revision of the CCP, the BTU appeal, the student safety problem in 1993 and co-counsels' occasional consultations.

We must not overlook plaintiffs' services on other major aspects of the case, including submissions to the Court and negotiations with defendants regarding the provisions of the Final Judgment entered May 31, 1990. Also, the Court's orders for construction and renovation of school facilities carried forward for ten years after promulgation of the Unified Facilities Plan on March 25, 1985. Related orders as to adequate funding for upkeep and maintenance of facilities were also monitored by the applicants and led to the reopening of the case in April 1991. Finally, complete unitariness has not yet been achieved by the defendants, and the case is still not completely closed, inasmuch as orders governing desegregation of faculty and staff are still in force and effect. Pursuant to paragraph (3) of the Final Judgment, affirmed by the First Circuit in 1991, these orders will be operative until black and Hispanic faculty and staff will have achieved sufficient seniority such that the applicable 25% and 10% percentages would not, in the superintendent's written opinion, be diminished substantially by a 3% reduction in force.

Applicant counsel also spent many hours compiling the data included in plaintiffs' several applications for awards of attorneys' fees; and the voluminous exhibits describing the services rendered. Tables of counsels' successive applications are set forth in the Overview of Applications section of this memorandum. Applicant counsel filed initial petitions in January 1990 and thereafter filed five supplementary applications, the last of which was received in October 1993.[17] Plaintiffs' entitlement to compensation for the time required to prepare numerous applications for fees, 62.25 by Atkins and 49.75 by

Pressman for a total of 112 hours, is undisputed.

Our only disallowance of applicants' hours is half of their work defeating the BTU's appeal to the Court of Appeals and follow-up petition for *certiorari*. As discussed *ante*, equitable considerations militate against full compensation to plaintiffs for time spent on the BTU appeal. Hours recorded by Pressman totalled 84.25, and hours recorded by Atkins totalled 26.5. Accordingly, we find that Pressman's hours spent reasonably in opposing the BTU appeal to have been 42, and Atkins' 13.

Deduction of these disallowed portions from total hours claimed, 430 by Atkins and 546 by Pressman, leaves balances of compensable hours reasonably spent by Atkins of 417 and by Pressman of 504. We so find.

### Hourly Rates

■ Plaintiffs have made a powerful case for the reasonableness of the hourly rates claimed by their attorneys. Both Atkins and Pressman have filed two supporting affidavits from well qualified practitioners attesting that the rates of compensation requested are on the conservative side. They also have filed surveys of rates for comparable legal services in the greater Boston community, including the 1983–84 edition of the American Lawyers Guide to Leading Law Firms, whose use was approved in *Grendel's Den,* 749 F.2d at 950; and a recent survey of the 100 largest law firms in Massachusetts published by Massachusetts Lawyers Weekly. Hourly rates sought by applicant counsel are well within the standards set in these surveys, and also are in accord with the Court's understanding of the hourly rates of experienced attorneys appearing in other major litigation. Civil rights cases are to be treated the same as complex federal litigation such as antitrust and securities cases for purposes of determining reasonable awards. *Wildman v. Lerner Stores Corp.* 771 F.2d 605, 612 (1st Cir.1985). Counsels' services in the instant case went beyond reasonable monitoring of prior court orders as in *Garri-*

---

17. Counsel have not sought compensation for miscellaneous services rendered thereafter, including a supplemental memorandum, filed on

June 1, 1995 responding to defendants' reliance upon the *Zipes* case in connection with the intervenor BTU appeal.

*ty,* 752 F.2d at 738, and involved active participation in the substantive issues not then resolved by the Court.

Defendants' position regarding hourly fees charged by the applicants, especially as set forth in defendants' memorandum in opposition filed December 13, 1993, does not challenge the reasonableness of the rates sought if the related services were rendered for so-called "core" services. On the basis of the record herein described and the reasons set forth in this memorandum of decision, we find the hourly rates stated in counsels' tables of periodic applications to have been reasonable. When applied to the totals of hours calculated in the previous section, they will constitute the lodestar components, subject to adjustments.

Defendants challenge the applicants' claims. In their opinion, the uniformity of the hourly rates claimed by plaintiffs impermissibly fails to apply lower rates for so-called "non-core" services. The issue developed as follows. In oral argument on April 18, 1990 and in a memorandum filed at the hearing, defendants divided the hours listed in plaintiffs' applications, which had been filed in January, into three classifications and assigned totals as follows: Atkins, 20.25 "core" hours, 114.75 "non-core" and 106 "not recoverable"; and Pressman, 29.56 "core" hours, 177.07 "non-core" and 20 "not recoverable." However, defendants did not specify which claimed hours were so classified. At the hearing, the Court asked that they do so; and they did in attachments to defendants' supplemental memorandum filed April 30, 1990, in which they classified each entry in counsel's applications as either "C", "NC" or "NR", meaning respectively core, non-core or not recoverable.[18] In a telling reply filed June 8, plaintiffs urged that the classifications be disregarded because made arbitrarily by a former special assistant corporation counsel who had no first-hand knowledge of the services or issues to which they related. True, a principled basis for defendants' line-drawing is difficult to discern. On the other hand, there is abundant authority for establishing different hourly rates for the same attorney to reflect differences in the types of services performed. *See Jacobs v. Mancuso,* 825 F.2d 559, 561 n. 3 (1st Cir.1987); *Miles,* 675 F.2d at 9. We have therefore considered in a general way[19] the merits of the classifications urged by the defendants.

The dichotomy of core versus non-core services requires, first, a definition of terms; and then, application of the definition to particular services. The standard that we adopt is the descriptive definition endorsed in *Brewster v. Dukakis,* 3 F.3d 488, 492 n. 4 (1st Cir.1993):

> Core work includes legal research, writing of legal documents, court appearances, negotiations with opposing counsel, monitoring and implementation of court orders. Non-core work consists of less demanding tasks, including letter writing and telephone conversations.

There is no fixed relationship between compensation for core and non-core work. Several cases use a ratio of 3/2 such that non-core work is compensated at a rate one third less than core, *see, e.g., id.* For reasons stated in the following Lodestar Adjustments section of the memorandum, we apply a rough 3/2 ratio in this case.

One substantial segment of attorneys' work is readily identifiable as having been treated by defendants as non-core[20] and warrants specific consideration: the 112 hours spent by applicant counsel preparing fee applications. Precedent in this Circuit is clear:

---

**18.** Thereafter defendants followed the same procedure in opposing plaintiffs' several subsequent periodic applications, listed *ante* in the Overview of Applications section.

**19.** In considering fee applications, the court need not "set forth hour-by-hour analyses of fee requests," *Jacobs,* 825 F.2d at 562, nor "drown in a rising tide of fee-generated minutiae," *United States v. Metropolitan Dist. Comm'n,* 847 F.2d 12, 16 (1st Cir.1988).

**20.** Defendants' memorandum filed December 13, 1993 states:

> Moreover, activities related to fee requests are not compensated at the same rate as other activities. *See, e.g., Grendel's Den v. Larkin,* 749 F.2d 945 (1st Cir.1984). The defendants have therefore considered fee related activities as non-core activities and suggest compensation for fee activities accordingly.

We have repeatedly held that time reasonably expended in connection with fee applications is itself compensable, *see, e.g., Lund v. Affleck,* 587 F.2d 75, 77 (1st Cir. 1978), but, since time spent in this exercise often amounts to little more than "documenting what a lawyer did and why he or she did it," *Gabriele v. Southworth,* 712 F.2d 1505, 1507 (1st Cir.1983), it may fairly be compensated at a reduced rate. *See id.; accord, Jacobs,* 825 F.2d at 563; *Miles v. Sampson,* 675 F.2d 5, 9 (1st Cir.1982). *Brewster,* 3 F.3d at 494.

In this case, applicant counsel have done more than document what they did and why they did it. The presumed closing date of the litigation was changed repeatedly, necessitating the submission of supplemental applications. In order to meet defendants' various legal objections, counsel assembled volumes of exhibits and filed several memoranda of law. The precedent applicable in this instance is *Massachusetts Dept. of Public Health v. School Comm.,* 841 F.Supp. 449, 462 (D.Mass.1993), in which Judge Keeton cautioned that Circuit precedent does not require reduction for work on fee applications in every case; and that where an application is challenged on legal as well as factual grounds, no reduction from general fees is required or appropriate. As discussed *ante,* plaintiffs in this case confronted several legal objections. Accordingly, we find that plaintiffs' counsel are entitled to the same rate of compensation for time spent preparing fee applications as for general services.

### Lodestar Adjustments

Advancing to step three of our analysis of plaintiffs' applications, we make three tentative adjustments to the lodestar components described in the previous section. Two adjustments are upward to account for the delay in compensating counsel for work done long ago, *see Boston and Maine Corp.,* 776 F.2d at 11–13, and one is downward to reduce by one-third the hourly rate for services

properly classified as non-core, from $300 to $200 for Atkins and from $200 to $154 for Pressman. The upward adjustments are of two kinds, the first for the years 1989 through 1993 as to which counsels' 1993 rates are applied; and the second for the period from August 1993 (for Atkins) or October 1993 (for Pressman) to the present, as to which an increase amounting to interest at the rate of 6% *per annum* is tentatively ordered.

 The law in this area was unsettled until *Missouri v. Jenkins,* 491 U.S. 274, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989), which held that an upward adjustment of an attorney fee award to account for delay is permissible under § 1988. There the Supreme Court indicated that such an adjustment may be made "by the application of current rather than historical rates *or otherwise.*" *Id.* at 284, 109 S.Ct. at 2469 (emphasis added). "Historical rates" refers to those charged at the time the relevant services were performed. In this case, the tables of counsels' periodic applications in the Overview of Applications section list the historical rates of plaintiffs' attorneys during the periods in which their services were performed. To adjust in 1993 for the intervals between the periods covered and the dates of their applications, applicant counsel claimed their 1993 rates in lieu of their rates in previous years. As stated in *Massachusetts Dept. of Public Health,* 841 F.Supp. at 458: "[D]ue to the delay in compensating [attorney] Gary for the BSEA proceeding, it is appropriate to award fees at their current value."[21] Plaintiffs' 1993 adjustment in this case was, we find, reasonably warranted by the factors heretofore described. When applied to the hours previously calculated, it produces a fee for Atkins of $125,100 (417 hours times $300), and for Pressman of $100,800 (504 hours times $200).

A second tentative adjustment has been made because, through no fault of their own, applicants have been obliged to wait two and a half years beyond the fall of 1993 for

---

**21.** The law in the other Circuits is to the same effect. The Ninth Circuit found the failure of a District Judge to adjust rates of compensation to account for the lost time value of money to be an abuse of discretion. *In re Washington Public Power Supply System Securities Lit.,* 19 F.3d 1291, 1305 (9th Cir.1994).

receipt of compensation. Lacking evidence of current rates, we resort to the alternative "or otherwise" method, *see Jenkins*, 491 U.S. at 284, 109 S.Ct. at 2469, of adding an amount akin to prejudgment interest. In our opinion, reasonable prime rate of interest enhancement of 6% *per annum* entitles plaintiffs to a further upward adjustment of 15% of the compensation due them. Such interest should be simple, not compound. In *Gabriele*, 712 F.2d at 1507, the First Circuit accepted, without discussion, an 8% interest adjustment, stating: "[W]e do not deem it appropriate to compound the interest award for delay of payment." The dollar amounts of this second adjustment are, for Atkins, $18,765 ($125,100 times 15%), thus increasing his fee to $143,865; and, for Pressman, $15,-120 ($100,800 times 15%), increasing his fee to $115,920.

Our third and final adjustment is downward, and takes into account the lesser rate of compensation due for non-core work, one third less than for core work, specifically $200 for Atkins and $134 for Pressman. Independently of the defendants' classifications and contentions, and in light of our own intimate knowledge of the course of the proceedings and counsels' participation, we have reviewed counsels' statements of their charges and find that non-core work amounted to between 10% and 15% of the total. Thus, a reduction in the lodestar components to decrease compensation for non-core work[22] and enhancement for the delay since the 1993 filing of plaintiffs' applications are a virtual wash. We do not rely precisely or necessarily on these calculations or any mechanical formula. *See General Dynamics Corp. v. Horrigan*, 848 F.2d 321, 325 (1st Cir.1988). They are intended primarily to show that the Court has considered the pending applications from several points of reference. The equitable standard remains reasonableness. As a result of these three adjustments, two of which cancel each other out, we find appropriate reasonable fees of $125,100 for Atkins, and $100,800 for Pressman, subject to the final appraisals in the next section.

### Level of Success

■ Having examined particular aspects of plaintiffs' billing in detail, *see DeJesus v. Banco Popular de Puerto Rico*, 951 F.2d 3, 7 (1st Cir.1991), we step back to "consider whether the fee award, as adjusted, appears reasonable in the circumstances and is in overall proportion to what remained at stake in the winding-down of the litigation." *Brewster*, 3 F.3d at 494. In outlining this facet of the Court's responsibility, the Supreme Court in the seminal *Hensley* case, 461 U.S. at 434–35, 103 S.Ct. at 1939–41, posed the question; "[D]id the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?"; and issued the following instructions:

> Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation. Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee.

It would seem that a level of success can be best measured against the purposes with which a task is begun. In this case plaintiffs' overall goal when they filed their complaint 24 years ago may be stated simply: obtaining for their children the same educational opportunities in local public schools as were being offered to white children; or, more

---

**22.** The mathematics regarding Atkins are:

| | | |
|---|---|---|
| (1) | Total hours | 430 hrs. |
| (2) | Non-core at 10% | 43 hrs. |
| (3) | 90% core, 397 @ $300 | $119,100 |
| (4) | 10% non-core, 43 @ $200 | $8,600 |
| (5) | Lodestar component | $127,700 |

| | | |
|---|---|---|
| (2a) | Non-core at 15% | 64.5 hrs. |
| (3a) | 85% core, 365.5 @ $300 | $109,650 |
| (4a) | 15% non-core, 64.5 @ $200 | $12,900 |
| (5a) | Lodestar component | $122,500 |

Comparable calculations for Pressman yield $97,500 (10% non-core) and $95,784 (15% non-core).

precisely, eliminating the pervasive racial discrimination in the Boston school system against students of color. Without doubt plaintiffs obtained excellent results in reaching their goal in spite of their failure to enjoin implementation of the CCP in 1989. "'Victory' in a civil rights suit is typically a practical, rather than a strictly legal matter." *Aubin,* 782 F.2d at 291.

Plaintiffs' level of success has, of course, been considered previously in making previous awards of attorneys' fees. At issue here is their services during the four year period beginning January 1990 and ending October 1993. Returning to the *Brewster* guideline, what remained at stake, *inter alia,* were the provisions of the Final Judgment, funding for maintenance and upkeep of facilities, desegregation of faculty and staff, and performance of the Unified Facilities Plan. The particulars of counsels' services in these and other matters of advocacy are discussed at length in plaintiffs' applications and in this memorandum. Counsels' main mission, however, was monitoring defendants' compliance with previous orders, maintaining contact with the Department of Implementation and persevering to assure that defendants' obligation to desegregate faculty and staff would not end the moment it had been achieved.

During the last decade of this litigation orders of this Court and the First Circuit have been predicated explicitly on findings of defendants' good faith commitment to desegregation. *See, e.g., Morgan v. Nucci,* 620 F.Supp. at 228–29 (cited by the Court of Appeals in its 1987 decision). Still, support for desegregation within the school system and related governmental agencies has never been unanimous. It seems clear that the continuation of defendants' commitment to desegregation to this day has been due in substantial measure to vigilant monitoring by plaintiffs and their attorneys.

Enlarging upon Judge Selya's metaphor in *Brewster,*[23] this final award of attorneys' fees to plaintiffs' counsel is the caboose of a close-ly watched train. The journey has not always been smooth or direct; but with Messrs. Atkins and Pressman at the throttle, it reached its intended destination. They did a first class job and have earned first class compensation.

### CONCLUSION

On the basis of the foregoing findings of fact and conclusions of law, judgment shall enter awarding plaintiffs $128,162.69 for the fees and expenses of Thomas I. Atkins, Esq., and $100,000 for the fees of Robert Pressman, Esq.

### APPENDIX

United States District Court
District of Massachusetts

Tallulah Morgan et al., Plaintiffs,

v.

John A. Nucci et al., Defendants.

Civ. A. No. 72–911–G.

Sept. 3, 1985.

### FINAL ORDERS

GARRITY, District Judge.

After hearing and consideration of the parties' comments and positions on the draft final judgment[1] issued on July 5, 1985, and on the basis of all orders and memoranda of decisions previously entered in these proceedings, it is ORDERED and ADJUDGED that the school defendants, viz., members of the Boston school committee, Superintendent of Schools, their officers, agents, servants employees, attorneys, and all other persons in active concert or participation with them who have actual notice of these orders:

#### Unified Facilities Plan

(1) shall take all steps reasonably necessary, jointly with the city and state defen-

---

**23.** "Finally, this is the caboose of a litigation train that has chugged along for almost two decades." *Brewster,* 3 F.3d at 493.

**1.** In titling these orders "Final Orders" instead of "Final Judgment", as first drafted, we follow the precedent and adopt the reasoning of Judge McMillan in removing the cause from the active docket and closing the file in *Swann v. Charlotte-Mecklenburg Board of Education,* (W.D.N.C. 1975), 67 F.R.D. 648.

dants, to whom this paragraph also applies, to implement the Unified Facilities Plan as approved and modified by orders entered contemporaneously herewith.

### Permanent Injunction

(2) be permanently enjoined from discriminating on the basis of race in the operation of the public schools of the City of Boston and from creating, promoting or maintaining racial segregation in any school or other facility in the Boston public school system;

### Student Assignments

(3)(a) shall compose enrollments at each school so that its racial/ethnic proportions shall be consistent with current guidelines which shall be derived, with respect to citywide magnet schools and programs, from the citywide public school population and, with respect to district schools, from the public school populations of their current districts or consolidations thereof; and procedures for assigning students shall be objective, written and available to the public.

(b) alternatively, may beginning with the 1986–87 school year or thereafter use a single, citywide guideline for assigning students by composing enrollments at every school (except District 8 schools) so that its racial/ethnic proportions exclusive of entering K–1 students are within a range determined by a factor of .25 times the percent of each racial/ethnic group and are based upon the citywide public school population in K–1 through 12 as of about April 1 of the previous school year, minus (i) students enrolled in bilingual classes, (ii) students with special needs who are classified as substantially separate and (iii) students residing in District 8; provided further that, where necessary, the Department of Implementation may assign no other minority students to selected elementary schools, in which event their absence shall be offset by additional white students; and provided further that procedures for assigning students shall be objective, written and available to the public.

### Parent Councils

(4) shall promote the court-established parent councils, and any successor organizations, and assist them in functioning as self-governing organizations capable of meeting their court-ordered responsibilities; and shall fund them for at least three years from this date; and shall appoint to any School Improvement Council formed at any school pursuant to Chapter 188 of the Acts of 1985, parent membership elected by the related School Parent Council or successor organization.

### Faculty and Staff

(5) shall achieve and maintain a desegregated faculty and administrative staff which are each comprised of not less than 25% blacks and 10% other minorities, by increasing the proportions of black faculty and administrative staff at a rate of not less than one-half percent annually and the proportion of other minority faculty at the rate of not less than one-quarter percent annually, and of other minority administrative staff in accordance with the parties' agreement for a one out of three hiring ratio, approved and ordered by the court on November 26, 1984 and July 5, 1985.

### Department of Implementation

(6) shall maintain the Department of Implementation as a distinct unit, adequately staffed and with full access to computer facilities, capable of meeting its court-ordered responsibilities;

### Previous Orders

(7) shall carry out all existing orders imposing a duty on the school defendants previously entered in areas in which the court has not terminated its jurisdiction and, if modified as hereinafter provided, such modified orders.

### Modification Procedure

(8) The school defendants may propose modifications to any order previously entered in these proceedings provided (a) that such proposed modification is specific and does not violate the permanent orders stated in the

476

seven preceding paragraphs and (b) that notice and opportunity to be heard is given, as follows: they shall issue a public notice identifying the order to be modified and the proposed modification; and shall mail copies to (a) the State Board of Education, (b) the Attorney General for the Commonwealth, (c) the Mayor, (d) the Citywide Parent Council, (e) the Boston chapter of the NAACP, and (f) the Council of Administrators of Hispanic Agencies in Boston (CAHA), to all of whom the Department of Implementation shall promptly make available all relevant data reasonably requested. The Board of Education shall within three weeks initiate and moderate negotiations concerning the proposed modification or determine that the proposed modification is insubstantial or an emergency matter which the School Committee may adopt without negotiation. After agreement has been reached or the Board has determined that further negotiations would not result in agreement, or more than three months have passed since the public notice was given, whichever is earliest, the School Committee may (unless State Board approval is necessary under state law and has not been obtained) adopt or reject such proposed modification either as initially proposed or amended during negotiations.[2]

JUDGMENT AWARDING ATTORNEYS'
FEES AND EXPENSES

This action came on for hearing before the Court, Honorable W. Arthur Garrity, Jr., District Judge presiding, on plaintiffs' applications for attorneys' fees and expenses pursuant to 42 U.S.C. section 1988, and the issues having been duly heard and a decision having been duly rendered on the basis of the findings of fact and conclusions of law stated in the Memorandum of Decision filed contemporaneously herewith,

It is Ordered and Adjudged that the plaintiffs Tallulah Morgan *et al.* recover of the defendants Robert Gittens *et al.* the sum of $228,162.69, of which $128,162.69 shall be paid to Thomas I. Atkins, Esq., and $100,000

2. A memorandum regarding these final orders

to the Law and Education Center, Inc., for the services of Robert Pressman, Esq.

will be filed at a later date.